# United States Court of Appeals
## For the First Circuit

No. 04-1146
No. 04-1147

UNITED STATES OF AMERICA,

Appellee,

v.

TIMOTHY H. BRADLEY and KATHLEEN MARY O'DELL,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Saris,* District Judge.

William E. Christie with whom Shaheen & Gordon, P.A. was on consolidated brief for appellants.
Bradley J. Schlozman, Deputy Assistant Attorney General, with whom R. Alexander Acosta, Assistant Attorney General, Thomas P. Colantuono, United States Attorney, Jessica Dunsay Silver and Karl N. Gellert, Department of Justice, Civil Rights Division, Appellate Section, were on brief for appellee.

December 8, 2004

*Of the District of Massachusetts, sitting by designation.

**BOUDIN**, **Chief Judge**.  Timothy H. Bradley and Kathleen Mary O'Dell appeal from convictions for forced labor and related crimes.  The gist of the charges was that the defendants lured Jamaican laborers to New Hampshire through fraud, mistreated them during their employ and coerced them to stay.  From the evidence presented at trial, the jury could reasonably have found that the following events occurred.

In 1999, Bradley and O'Dell traveled to Jamaica to recruit seasonal workers for Bradley Tree Service, a tree removal company that they operated in New Hampshire.  In Jamaica, the defendants convinced two men--Livingston Wilson and Garth Clarke-- to come to work for them in the United States.  The men were promised wages of $15-20 per hour and lodging in one of two houses on Bradley and O'Dell's property.

When Wilson and Clarke arrived in New Hampshire to begin their work, they were provided a camping trailer--initially without running water, electricity or heat.  Both Jamaicans were paid $7 per hour rather than the $15-20 they had been promised.  At work, yells, curses and intimidation were directed at them.[1]  After a week, Clarke fled to New York where he received a phone call from

_____

[1]There was also evidence that Bradley was indifferent to injuries of the two men, failing to take them for doctor or hospital care when seemingly required.  However, the evidence was ambiguous as to the degree of medical need and the extent to which it was requested.

O'Dell, who threatened to "kick his ass"--as well as call the police, the FBI, and the immigration service--if he did not return.

Bradley stated in front of Wilson that he planned to "take his gun and go to New York and look for [Clarke]." After Clarke's departure, the defendants also seized Wilson's passport and plane tickets. Bradley frequently got angry and yelled at Wilson on the job site, occasionally pushing him down. Clarke never returned to New Hampshire but instead went on from New York to Jamaica. Wilson eventually returned to Jamaica when his work visa expired in October 2000.

Shortly after Wilson's departure, the defendants again traveled to Jamaica and recruited Martin Sadler, Andrew Flynn and David Hutchinson to work for Bradley Tree Service from April to October 2001, promising each of the latter two men wages of at least $11 per hour. When the men arrived in New Hampshire, O'Dell took all three of their passports, explaining that in the previous year a worker had run away--and that Bradley would hire someone in Jamaica to "destroy" that man. Flynn and Hutchinson were both frightened by this statement, believing that murder for hire was quite feasible in Jamaica.

As with their predecessors, the three men were badly housed and ill-treated. They were paid $8 per hour rather than the $11 promised and were charged $50 a week in rent. When Hutchinson argued with Bradley about pay and rent, he was told that he only

needed to stay and work long enough to repay $1,000 allegedly spent on his ticket--money that Hutchinson did not have. The defendants hindered the men when they sought treatment for injuries or medical care, and O'Dell kept tabs on the men's whereabouts although they traveled on their own in the neighborhood and elsewhere.

In September 2001, the local police visited in response to an anonymous tip that Jamaican laborers were being held against their will. When interviewed, Flynn and Hutchinson complained about their treatment; O'Dell told the officers that the men were free to leave but would have to pay for their return tickets. When the police left, Bradley browbeat the men and pushed one of them, seeking to learn who had called the police.

During this encounter Bradley grabbed Hutchinson by the neck and started to choke him. Flynn fled to a neighbor's house. O'Dell reported this to Bradley and then herself began to hit Hutchinson. After a struggle with Bradley and O'Dell, Hutchinson also fled to the neighbor's house; from there both men went to the police and spent the evening in a shelter. They remained in the United States until the time of Bradley and O'Dell's trial, working at other jobs and apparently receiving assistance from the government.

In April 2003, a federal grand jury in New Hampshire returned a 21-count indictment against Bradley and O'Dell. Counts 1-9 consisted of one count of conspiracy to commit forced labor, 18

U.S.C. §§ 371 & 1589 (2000); two counts of forced labor, 18 U.S.C. § 1589; two counts of attempted forced labor, 18 U.S.C. § 1594 (2000); two counts of trafficking into forced labor, 18 U.S.C. § 1590 (2000); and two counts of document servitude, 18 U.S.C. § 1592 (2000). These counts dealt solely with Bradley and O'Dell's treatment of Flynn and Hutchinson.[2]

Counts 10-14 were for wire fraud, 18 U.S.C. § 1343 (2000), arising out of the recruitment and employment of Clarke and Wilson. Counts 15-20 were for wire fraud arising out of the 2001 recruitment and employment of Flynn and Hutchinson. Count 21 charged O'Dell with making a false statement to an FBI agent regarding her role in Bradley Tree Service. 18 U.S.C. § 1001 (2000).

After trial in August 2003, the jury convicted the defendants on all counts except for the false statement charge and the attempted forced labor charges (which the jury did not consider after convicting on the underlying offenses). In January 2004, the district judge sentenced Bradley and O'Dell each to 70 months' imprisonment (the bottom of the calculated Guidelines range), fined Bradley $12,500 and ordered the defendants to pay $13,052 in restitution.

---

[2]The statute proscribing forced labor, Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 112(a)(2), 114 Stat. 1464, 1486-87 (codified at 18 U.S.C. § 1589), was not enacted until October 28, 2000--after the defendants' relationship with Clarke and Wilson had ended.

On appeal, Bradley and O'Dell contest both their convictions and their sentences. In particular, they challenge a number of alleged errors in the district court's jury instructions; the introduction of evidence regarding their treatment of Wilson and Clarke in 1999-2000; and the application of two sentencing enhancements under U.S.S.G. § 2H4.1.

We begin with the jury instructions. The main statute under which the defendants were charged is captioned "Forced Labor"; so far as relevant here, the statute makes it a criminal act for anyone "knowingly" to "provide[] or obtain[] the labor or services of a person"

> (1) by threats of serious harm to, or physical restraint against, that person or another person; [or]
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589.

The defendants' first challenge is to the district court's instruction defining "serious harm," which read as follows:

> The term "serious harm" includes both physical and non-physical types of harm. Therefore, a threat of serious harm includes any threats--includes threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or to continue providing labor or services.

Bradley and O'Dell claim that this definition expands the meaning of serious harm beyond the limits contemplated by 18 U.S.C. § 1589.

Section 1589 is a recent addition to the chapter that makes criminal acts of slavery, peonage and holding to involuntary servitude, 18 U.S.C. §§ 1581-1594 (2000). Adopted in 2000 as part of a broader set of provisions--the Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1464--section 1589 was intended expressly to counter United States v. Kozminski, 487 U.S. 931 (1988). See H.R. Conf. Rep. No. 106-939, at 100-01 (2000). In Kozminski the Supreme Court had interpreted the pre-existing ban on "involuntary servitude" in section 1584 to prohibit only conduct involving the use or threatened use of physical or legal coercion. 487 U.S. at 949-52.

In glossing the new statute, the conference report said "serious harm" was intended to encompass not only physical violence, but also more subtle psychological methods of coercion-- "such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. No. 106-939, at 101. It continued: "The term 'serious harm' as used in this Act refers to a broad array of harms, including both physical and nonphysical . . . ." Id.

Bradley and O'Dell argue that the conference report's reference to "dire consequences" stands in sharp contrast to the

district court's instruction, which states that serious harm can include "any consequences." They further claim that the district court's definition could apply to a broad range of innocent conduct, such as employers who legitimately convince their "victims" to continue working, for example, by threatening to withhold future pay that is sorely needed by a worker.

Starting with the extent of pressure, we note that Congress did not use "dire consequences" in the statute; it said "serious harm" and the district court properly charged in those words. We read the instruction's reference to "any consequences" as explaining that non-physical as well as physical consequences should be considered. Instructions must be read as a whole, see United States v. Serino, 835 F.2d 924, 930 (1st Cir. 1987), and no jury, taking the above-quoted paragraph as a whole, could think that trivial consequences would suffice.

We do agree that the phrase "serious harm," as extended to non-physical coercion, creates a potential for jury misunderstanding as to the nature of the pressure that is proscribed. Taken literally, Congress' "threats" and "scheme" language could be read to encompass conduct such as the employer's "threat" not to pay for passage home if an employee left early. Depending upon the contract, surely such a "threat" could be a legitimate stance for the employer and not criminal conduct.

Thus, in an appropriate case we think that the court in instructing the jury would be required to draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences. However, Bradley and O'Dell do not appear to have sought any such instruction. Instead, the instructions sought so badly understated the reach of the statute that it would have been improper to have given them.[3]

The question, then, is whether the district court should as a matter of course have included qualifying language explaining that some warnings from the employer could be legitimate and to differentiate such warnings from illicit threats. Arguably, a standard instruction should embody such a caveat; it is also arguable that the caveat would be required only on evidence that might bring the case within the caveat. But we need not decide the point here because seemingly no appropriate objection was made on the record.

Neither the defendants' proffered instructions nor any prior discussion on the record suggests that defendants were

---

[3]Merely as examples, one instruction included the statement that the proscribed threat must be one "that involves a substantial risk to death, extreme physical pain, protracted and obvious disfigurement, or the protracted loss or impairment of the function of a bodily member, organ or mental faculty." Another said in part: "[T]he use of psychological coercion to force someone to work is not enough to find a defendant guilty of Forced Labor. . . . The Government must prove that [the victims] reasonably believed they had no alternative to continue working other than imprisonment or worse."

seeking to exclude innocent warnings from the class of threats that would violate the statute. The defendants' only pertinent on-the-record objection was that the court had "expanded the forced labor statute beyond its writing and incorporated areas that are not envisioned by the statute." Without further elaboration this does not satisfy the specificity required by Fed. R. Crim. P. 30(d), and review is available only for plain error. See United States v. Olano, 507 U.S. 725, 731-37 (1993).

The defendants' brief suggests that the plain error test can be avoided because of counsel's "off-the-record" discussion with the district judge about the instructions. If this discussion had included an objection to the "any consequences" language on the specific ground that the phrase required a caveat to exclude legitimate warnings (e.g., of no future wages), we would be faced with three interesting issues: whether the claim of error was thereby preserved, whether on these facts there was error in omitting the caveat, and whether any such error was harmless.

Off-the-record chambers conferences with counsel on jury instructions are not uncommon in civil cases, but are perhaps less usual in criminal ones. They are not forbidden by the Court Reporter's Act, 28 U.S.C. § 753(b) (2000),[4] although the Second

---

[4]Accord United States v. Murphy, 768 F.2d 1518, 1535-36 (7th Cir. 1985), cert. denied, 475 U.S. 1012 (1986); United States v. Jenkins, 442 F.2d 429, 438 (5th Cir. 1971); cf. Wright v. Smith, 569 F.2d 1188, 1190-91 (2d Cir. 1978) (off-the-record bench conference in state proceedings).

Circuit has pointed out that they can create difficulties for a reviewing court, especially where any effort is made thereafter to rely on matters that allegedly took place in the off-the-record conference.  See Wright, 569 F.2d at 1190 n.5.  Whether or not an off-the-record conference occurs, counsel remains obligated--as we have clearly held--to put requests for instructions and objections on the record.  United States v. Coady, 809 F.2d 119, 123 (1st Cir. 1987); see also Fed. R. Crim. P. 30.

The problem is compounded here because the district court, in eliciting post-charge objections in the courtroom, suggested that counsel did not need to elaborate upon earlier objections already discussed off the record.  If there were any suggestion that the defendants had objected to the lack of language protecting "innocent threats" in their earlier off-the-record conference, we could be faced with a serious difficulty, but no such suggestion is present in this case: the defendants' brief carefully avoids saying that trial counsel raised such a specific objection in chambers, and the evidence and closing arguments do not suggest that a caveat regarding "innocent threats" had been sought.[5]

_____

[5]Some circuits are indulgent where an objection on the record cross-references what was said in an off-the-record charge conference, see United States v. Purvis, 21 F.3d 1128, 1130 (D.C. Cir. 1994); see also United States v. Murphy, 768 F.2d 1518, 1535-36 (7th Cir. 1985), cert. denied, 475 U.S. 1012 (1986).  This circuit has been less sympathetic, see, e.g., United States v. Santana-Rosa, 132 F.3d 860, 863 n.1 (1st Cir. 1998); United States

There was no plain error here.  No evidence was offered at trial that the defendants made "legitimate" threats, so there is no risk that the jury convicted them for such threats.  The defendants' arguable threats or coercion involved the taking of passports and mentions of violence, combined with what the jury could have found to be complementary scrutiny of, or restrictions on, the victims' local travel.  So even if the instruction was overbroad, it did not "likely" affect the outcome or threaten a miscarriage of justice, as plain error doctrine requires.  See United States v. Sotomayor-Vazquez, 249 F.3d 1, 19 (1st Cir. 2001).

Bradley and O'Dell also claim that the district court's instructions adopted an overly subjective test for whether Hutchinson and Flynn felt compelled to work by the defendants' actions.  In particular, they point to the following statement:

> You may also consider Mr. Hutchinson's and Mr. Flynn's special vulnerabilities, if any.  In this regard you may consider whether or not all persons are of the same courage or firmness.  You may consider, for example, Mr. Hutchinson's and Mr. Flynn's background, physical and mental condition, experience, education, socioeconomic status, and any inequalities between Mr. Hutchinson and Mr. Flynn and the defendants with respect to these considerations, including their relative stations in life.  You may consider and weigh whether or not Mr. Hutchinson and Mr. Flynn were vulnerable in some way so that the

---

v. Nason, 9 F.3d 155, 160-61 (1st Cir. 1993), cert. denied, 510 U.S. 1207 (1994); Coady, 809 F.2d at 123, and counsel would be well advised to insist upon putting fully on the record any request or objection sought to be preserved on appeal.

-12-

actions of the defendant, even if not sufficient to compel another person to work, were enough to compel Mr. Hutchinson and Mr. Flynn to work.

This and the rest of the defendants' remaining claims of instructional error are also subject to only plain error review for the reason described above, but as to each we find no error at all, plain or otherwise.

The test of undue pressure is an objective one, asking how a reasonable employee would have behaved; to rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems (e.g., scienter). But, as the defendants concede, known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigrant status) bear on whether the employee's labor was "obtain[ed]" by forbidden means. See H.R. Conf. Rep. No. 106-939, at 101; see also Kozminski, 487 U.S. at 952; United States v. Alzanki, 54 F.3d 994, 1000-01 (1st Cir. 1995), cert. denied, 516 U.S. 1111 (1996).

Viewed with the rest of the charge, the district court's instruction makes clear that any fear of serious harm on the part of Hutchinson or Flynn needed to be reasonable for an individual with his special vulnerabilities.[6] Nor did the evidence or

---

[6]For example, the same paragraph of the instructions cited by the defendants also directed the jurors to "determine whether [the threat of serious harm] was sufficient to cause Mr. Hutchinson or Mr. Flynn reasonably to believe that he had no choice but to work or to remain working for Bradley Tree Service."

-13-

arguments indicate that there were, or that the jury should consider, any peculiar vulnerabilities of the victims not fairly apparent from their objective circumstances (immigrant status, lack of local ties). There is also no indication that the defendants asked for an instruction to deal with hidden vulnerabilities.

Bradley and O'Dell's third objection is to the district court's instruction on Hutchinson and Flynn's opportunity to flee, which read:

> The government . . . need not prove physical restraint; such as, the use of chains, barbed wire, or locked doors, in order to establish the offense of forced labor. The fact that Mr. Hutchinson or Mr. Flynn may have had an opportunity to flee is not determinative of the question of forced labor if either or both of the defendants placed Mr. Hutchinson or Mr. Flynn in such fear or circumstances that he did not reasonably believe he could leave.

Pointing to the Eleventh Circuit's pattern jury instructions for involuntary servitude, the defendants claim that the opportunity to flee is determinative of forced labor--and that the district court's instruction once again erroneously replaces objective analysis with a subjective standard for coercion.

The Eleventh Circuit's pattern instruction is not in conflict with the charge just quoted; it tells the jury to "consider . . . any reasonable means the person may have had to escape" in deciding whether the person reasonably believed that he was being compelled to serve. <u>Eleventh Circuit Pattern Jury</u>

-14-

Instructions (Criminal Cases) 2003 at 365.  We see nothing wrong with the pattern instruction; but the defendants did not ask for the pattern instruction and the language that the court used in this case is not erroneous.

The defendants' fourth objection is to the district court's instruction on the payment of wages to victims:

> [W]hether a person is paid a salary or a wage is not determinative of the question of whether that person has been held in forced labor.  In other words, if a person is compelled to labor against his will by any one of the means prohibited by the forced labor statute, such service is forced, even if he is paid or compensated for the work.

Noting that Hutchinson and Flynn were both paid above the minimum wage, Bradley and O'Dell claim that the district court should have instructed the jury to consider whether payment of wages was the reason for the victims' decision to work.

Once again, the instruction given is correct.  The defendants were free to ask for their own version as a complement to the charge given but they did not.  Of course, they were free to argue to the jury (as they did) that the reason the victims remained was because of pay rather than threats.  The charge as a whole made amply clear that the defendants could be convicted only if their threats and abusive conduct reasonably coerced or forced Flynn or Hutchinson to provide labor.

We turn next to an entirely separate claim of error. Over the course of the eight-day trial, slightly over one day of

-15-

testimony concerned the defendants' treatment of Wilson and Clarke. This included their recruitment by the defendants, their experience at the defendants' hands, and Clarke's flight and the subsequent seizure of Wilson's passport. On this appeal, the defendants claim that the testimony was irrelevant, prejudicial and comprised forbidden character evidence. Fed R. Evid. 401, 403, 404.

The evidence of the recruitment, low wages and bad housing of Wilson and Clarke was plainly relevant to the charges in the indictment that the defendants had defrauded both men. However, no forced labor counts were based upon their treatment, see note 2 above. Thus one might fairly ask why certain portions of the testimony as to Wilson and Clarke were relevant-- specifically, those parts concerning verbal abuse, the apparent indifference to Wilson and Clarke's medical needs, and the circumstances of Clarke's flight.

Evidence of prior bad acts to show bad character, and so a propensity to commit crimes, is forbidden for reasons of policy; but prior bad acts that are otherwise specially relevant are still permitted so long as prejudice does not substantially outweigh probative value. See Fed. R. Evid. 403, 404; United States v. Van Horn, 277 F.3d 48, 57 (1st Cir. 2002). Unfortunately for the defendants, most of the key evidence of the treatment of Wilson and Clarke is relevant to the forced labor charges concerning Flynn and

Hutchinson--independent of the forbidden inferences as to the defendants' character.

This is assuredly so of what is the most damaging evidence--that Clarke fled, was pursued by threats, and that Wilson's passport was then seized. These circumstances give a malign motive for, and provide the context of, the later seizure of Flynn and Hutchinson's passports and of the initial threat made to them based on Bradley's supposed intention to "destroy" a former worker. Motive evidence is a settled exception to Rule 404's general ban. See Fed. R. Evid. 404(b); United States v. Cintolo, 818 F.2d 980, 1000 (1st Cir.), cert. denied, 484 U.S. 913 (1987).

The abusive treatment of Wilson and Clarke, apart from their bad housing, is closer to the margin. A showing of bad acts is permitted to demonstrate a defendant's intent or plan, see, e.g., United States v. Spinosa, 982 F.2d 620, 628 (1st Cir. 1992); United States v. Wood, 924 F.2d 399, 401 (1st Cir. 1991), and the intimidation of Wilson and Clarke, including their isolation from medical care, was arguably part of a pattern of intimidation that carried over to Flynn and Hutchinson. Yet bad acts comprising most criminal careers form a pattern so, taken too broadly, the exception could be made to swallow the rule.

Because none of the laborers was held in formal captivity, the government in this case faced inevitable doubts as to whether the defendants were merely abusive employers or

deliberately sought to compel forced labor. Arguably the defendants' prior treatment of Wilson and Clarke, so far as it showed efforts to intimidate them and minimize their outside contact, tended to reinforce the inference that the later, similar treatment of Flynn and Hutchinson was part of a deliberate scheme to hold laborers by intimidation. There is certainly precedent for such reasoning.[7]

The main issue, then, is not relevance (over and above propensity) but how much prejudice was added by the less necessary detail as to the abuse suffered by Wilson and Clarke. For the most part, it was not different than the treatment meted out to Flynn and Hutchinson and so was unlikely to inflame the jury. And, of course, Rules 403 and 404 weigh the decision in the government's favor by saying that evidence is excluded only if probative value is substantially outweighed by prejudice.

We note, finally, that the judge gave the customary limiting instruction. Without being naive about the effect of such

_____

[7]See, e.g., United States v. Decicco, 370 F.3d 206, 212-13 (1st Cir. 2004) (evidence of previous warehouse fire in arson prosecution); United States v. Burgos, 254 F.3d 8, 15 (1st Cir.) (evidence of defendant's history of narcotics trafficking probative of knowledge or intent to arrange drug transaction), cert. denied, 534 U.S. 1010 (2001); Spinosa, 982 F.2d at 628 (past drug crimes "probative of the fact that [the defendant] was not merely an innocent driver who was involved in the transaction by accident"); United States v. Hadfield, 918 F.2d 987, 994 (1st Cir. 1990) ("We have often upheld the admission of evidence of prior narcotics involvement in drug trafficking cases to prove knowledge and intent."), cert. denied, 500 U.S. 936 (1991).

instructions, they are still worth something--especially where, as here, the fairly debatable evidence had at least some relevance and was not dramatically prejudicial. See Van Horn, 277 F.3d at 58-59. Perhaps more pruning would have been suitable, but on close calls of this kind we will not interfere with the district judge's reasonable judgment.

This brings us to the last set of issues in the case, which relate to sentencing. The district court used the 2003 edition of the guidelines and sentenced Bradley and O'Dell under the provisions of U.S.S.G. § 2H4.1, captioned "Peonage, Involuntary Servitude, and Slave Trade." The base offense level for this offense as to either victim was 22 and, under the grouping rules, this trumped the lower levels generated by the fraud offenses against Flynn and Hutchinson. U.S.S.G. § 3D1.3(a).

Offense-specific enhancements added three more levels-- one level because Flynn and Hutchinson had been held for more than 30 days, U.S.S.G. § 2H4.1(b)(3)(C), and two levels more because another felony (here, fraud) had been committed in connection with the main offense. U.S.S.G. § 2H4.1(b)(4)(A). These enhancements, which raised the offense level from 22 to 25, are the subject of the defendants' remaining claims of error.

The fact that the crimes were committed against two victims--Flynn and Hutchinson--doubled the number of crimes but does not double the final offense level; instead, it results, in

this case, in an upward adjustment of two more levels under the table provided by U.S.S.G. § 3D1.4, yielding a combined final offense level of 27 for each defendant. The defendants' convictions for defrauding Wilson and Clarke generated no additional upward adjustment. With criminal history categories of I, both Bradley and O'Dell were sentenced to 70 months' imprisonment--the bottom of the applicable Guidelines range.

On appeal, Bradley and O'Dell contest the application of the guidelines on two substantive grounds: first, that the enhancements under 2H4.1(b)(3) and (4) are not intended to apply to forced labor offenses; and second, that 2H4.1(b)(4)'s enhancement for the related commission of wire fraud constitutes an impermissible "double-counting" of their conduct. The defendants also say that Blakely v. Washington, 124 S. Ct. 2531 (2004), renders the Guidelines--and in particular the enhancements-- unconstitutional.

The caption of section 2H4.1 and some of its internal language refer to "peonage" and "involuntary servitude" but not forced labor. The defendants concede that the section itself does encompass forced labor under 18 U.S.C. § 1589--and Guideline Amendment 627 (Nov. 1, 2001) so declares--but they point out that the guideline clauses imposing enhancements for length of time and commission of another offense refer explicitly to peonage and

involuntary servitude and were never amended to refer to forced labor.

Despite some initial appeal, the defendants' literal language argument is undermined by an understanding of the history and the underlying policy objectives of Congress and the Sentencing Commission. In the 2000 statutory amendment adding forced labor as an offense, Congress' premise was that the Supreme Court had mistakenly narrowed the definition of involuntary servitude by limiting to it physical coercion. Indeed, the Senate bill handled the matter by redefining and enlarging the offense of involuntary servitude. See S. Amend. 4027, 106th Cong. § 12 (2000); S. Amend. 4028, 106th Cong. § 12 (2000).

Ultimately Congress adopted the House format for remedying Kozminski by creating a new forced labor offense. See H.R. Conf. Rep. No. 106-939, at 99-101. But this new nomenclature does not alter the fact that Congress thought of forced labor as a species of involuntary servitude. Indeed, the 2000 statute made other changes to Title 22 of the U.S. Code that make this crystal clear. It there described "involuntary servitude" in the same terms used for the new "forced labor" offense, calling the former:

> a condition of servitude induced by means of . . . any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint . . . .

-21-

Victims of Trafficking and Violence Protection Act of 2000, §
103(5), 114 Stat. at 1469 (codified at 22 U.S.C. § 7102(5) (2000)).
Similarly, the Act's purposes state that "[i]nvoluntary servitude
statutes are intended to reach cases in which persons are held in
a condition of servitude through nonviolent coercion."  Id. §
102(13), 114 Stat. at 1467 (codified at 22 U.S.C. § 7101(b)(13)
(2000)).

Thus, Congress' evident purpose, properly attributed to
the Commission, was to treat forced labor as a form of involuntary
servitude.  It follows that an enhancement applicable to the latter
reaches the former--just as section 2H4.1 of the Guidelines
embraces "forced labor" despite its narrower caption ("Peonage,
Involuntary Servitude, and Slave Trade").  Against this background,
the defendants place too much reliance on the Commission's failure
to update the language in the caption and enhancements by adding
the words "forced labor."

The defendants next dispute the application of the two-
level enhancement based on the wire fraud counts.  They say that
because the wire fraud also comprised an overt act in furtherance
of the forced labor conspiracy, "impermissible double-counting"
would result from imposing an upward adjustment because of the wire
fraud.  For this view they rely upon United States v. Sedoma, 332
F.3d 20 (1st Cir. 2003).

-22-

An event or action occurring in the course of an offense can readily result in a separate enhancement or penalty; witness the use of gun during a theft of drugs. 18 U.S.C. § 924(c)(1)(A) (2000); see also United States v. Adams, 375 F.3d 108, 111 (1st Cir. 2004). And, from a policy standpoint, the fact that a separate crime was committed as part of the forced labor conspiracy gives good reason for extra punishment. Double-counting is not automatically forbidden, see United States v. Lilly, 13 F.3d 15, 19 (1st Cir. 1994), but here there was none.

Sedoma is inapposite. In that case, the issue was whether the same conduct (a police officer's fraud upon Rhode Island and its police department) should result in two separate upward adjustments--once as a specific offense characteristic for abuse of a position of trust, and again as a separate offense group under U.S.S.G. § 3D1.4. Sedoma, 332 F.3d at 28. Here the wire fraud counts did not result in any additional adjustment under the grouping rules of section 3D1.4. The concern present in Sedoma is absent here.

Finally, Bradley and O'Dell's Blakely challenges, which contest both the constitutionality of the district court's sentencing enhancements and the validity of the Guidelines themselves, were forfeit, having been raised neither in the district court nor in the defendants' initial briefs in this court. Under governing precedent in this circuit, there was no plain error

in adhering to the Guidelines, as the Supreme Court has not yet declared them invalid.  See United States v. Cordoza-Estrada, 385 F.3d 56, 60 (1st Cir. 2004); United States v. Morgan, 384 F.3d 1, 8 (1st Cir. 2004).

As to the sentencing enhancements, the result would not differ even if the Supreme Court ultimately holds that such enhancements must be based on facts found by a jury.  The district court's two "independent findings" upon which the enhancements relied--the length of time Hutchinson and Flynn were held in involuntary servitude and the involvement of the wire fraud offenses--were amply supported and not even contested at sentencing.  See Cordoza-Estrada, 385 F.3d at 59-60; Morgan, 384 F.3d at 8.

Affirmed.