# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-1112, 07-1113 & 07-1281

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

ELNORA M. CALIMLIM and JEFFERSON N. CALIMLIM,

*Defendants-Appellants/Cross-Appellees.*

_____

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 0248—**Rudolph T. Randa**, *Chief Judge*.

_____

ARGUED JANUARY 9, 2008—DECIDED AUGUST 15, 2008

_____

Before WOOD, SYKES, and TINDER, *Circuit Judges*.

WOOD, *Circuit Judge.*  At age 16, Irma Martinez began working for the Mendoza family in the Philippines, where it is common for wealthier families to have a live-in housekeeper to attend to the house and children. Her family was poor and depended on the salary she earned.

At the urging of Dr. Jovito Mendoza (the father of defendant Elnora Calimlim), Martinez traveled to the United States when she was about 19 years old. She told consular officials that she needed a visa in order to accompany Dr. Mendoza, who was going to the United States for medical treatment, but she really intended to stay in the United States to work. Her visa permitted a two-year stay as long as she departed and re-entered the United States at least once every six months.

When Martinez arrived, Jefferson and Elnora Calimlim confiscated her passport and told her that she would have to reimburse the Mendozas for the cost of her plane ticket. The Calimlims told her she was in the United States illegally from the day after she arrived. Martinez was unable to communicate in English for the first five or six years of her stay.

Martinez worked for the Calimlims, both of whom are physicians, as a live-in housekeeper. Her daily routine usually began at 6:00 a.m. and ended around 10:00 p.m., seven days a week as well as during most vacations. Her duties initially included caring for the Calimlim household and children; eventually they expanded to include the family cars, investment properties, and medical offices. After ten years, the family moved to a more luxurious house, 8,600 square feet in area and equipped with a private tennis court. Martinez provided their only household help.

While she worked for the Calimlims, Martinez was greatly restricted in what she could do. She never walked out the front door of the first house, and only answered the

door in the second house once—on Halloween, wearing a mask. She was told not to play outside with the children or leave her room in the basement during social functions, even to go to the bathroom. She was permitted to walk to church (one selected by Elnora), but only via a back path that was well away from possible observation. Elnora did not allow her to go to the same church too many times in a row. When she was driven someplace she had to ride in the back seat with her head down so that nobody could see her. The "house rules" included a phone code that enabled Martinez to answer the phone when the children called, but not when outsiders did. The children were told not to discuss Martinez with anyone outside the family. Martinez was not permitted to seek medical care outside of the house, even for special needs such as dentistry.

The Calimlims allowed Martinez to speak with her family four or five times over the 19 years she was with them, and even then she was surrounded by the Calimlim family while speaking on the phone. Martinez initially had a savings account into which her earnings were deposited, but Elnora closed it one day after Martinez's visa expired. Martinez authorized Elnora to send money to Martinez's family in the Philippines through Elnora's parents' account, but over the entire 19-year period, the total that the Calimlims sent was only 654,412 pesos, or about $19,000. Martinez's "earnings" were nothing but a book entry in the Calimlims' accounts. Martinez was allowed to shop for personal items, but she had to leave the cart in the store (so that Elnora Calimlim could pay) and go wait in the car; she would later "reimburse" the Calimlims for the

cost through withheld "wages." Martinez was told repeatedly by the adult Calimlims and their children that if anyone discovered her she could be arrested, imprisoned, and deported, and she would not be able to send any more money back to her family. Fear of that consequence kept her from breaking any of the rules or appearing outside the house.

On September 29, 2004, federal agents, acting on an anonymous tip, executed a search warrant and found a trembling Martinez huddled in the closet of her bedroom. A federal grand jury returned a third superseding indictment on December 6, 2005, charging the Calimlims with obtaining and conspiring to obtain forced labor (Counts 1 and 2), in violation of 18 U.S.C. §§ 371, 1589, and 1594, and harboring and conspiring to harbor an alien for private financial gain (Counts 3 and 4), in violation of 8 U.S.C. § 1324(a)(1). A jury convicted them of all four counts on May 26, 2006. On November 16, 2006, the district court sentenced the Calimlims to 48 months' imprisonment on each count, to run concurrently. Bond was denied pending appeal.

The Calimlims appeal their convictions, and the Government has cross-appealed from the district court's refusal to apply several enhancements in its calculation of the advisory Sentencing Guideline range. We find no error in the convictions, but we agree with the Government that resentencing is required, and so we reverse and remand for that purpose.

**I**

The Calimlims challenge their convictions on several grounds: that the forced labor statute is vague and overbroad, that the jury instructions on the forced labor counts failed to exclude the possibility of a conviction for innocent actions, and that there was insufficient evidence of financial gain on the harboring counts.

### A.  Vagueness and Overbreadth

The Calimlims raise two constitutional challenges to the forced labor statute, 18 U.S.C. § 1589. First, they argue that the statute is so vague that it fails to provide notice of what is criminalized, and second, that it is overbroad enough to punish innocent activity. They do not specify which provision of the Constitution supports their position, but the first argument apparently alludes to the Due Process Clause of the Fifth Amendment, and the overbreadth argument sounds like a First Amendment free speech challenge.

A vagueness challenge is best described by the evils it seeks to prevent: "Unconstitutionally vague statutes pose two primary difficulties: (1) they fail to provide due notice so that 'ordinary people can understand what conduct is prohibited,' and (2) they 'encourage arbitrary and discriminatory enforcement.'" *United States v. Cherry*, 938 F.2d 748, 753 (7th Cir. 1991) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The Calimlims argue that the statute failed to put them on notice that warning Martinez that she was violating the law by being in the country

illegally could be construed as violating the forced labor statute. This point overlaps to some degree with their overbreadth argument. They also assert that this prosecution took the statute beyond the boundaries Congress intended. Neither argument has merit.

We find that the forced labor statute provides sufficient notice of what it criminalizes. Under 18 U.S.C. § 1589, it is illegal

> knowingly [to] provide[] or obtain[] the labor or services of a person—
>
>    (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
>    (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
>    (3) by means of the abuse or threatened abuse of law or the legal process . . . .

The Government did not allege that the Calimlims made direct threats against Martinez within the scope of § 1589(1); the charges rest on subparts (2) and (3). They kept Martinez under physical restraint and caused her to believe that she might be deported and her family seriously harmed because she would no longer be able to send money. They also implicitly threatened her with deportation proceedings. Looking at those charges, the Calimlims argue that the phrases "serious harm" and "threatened abuse of the law or the legal process" are too vague to

support criminal liability. They argue that while they did notify Martinez that a threat existed from other quarters, they did not threaten Martinez that they would take action themselves.

A vagueness challenge not premised on the First Amendment is evaluated as-applied, rather than facially. *Chapman v. United States*, 500 U.S. 453, 467 (1991). Here, the action criminalized by § 1589—"knowingly provid[ing] or obtain[ing] the labor or services of a person"—is sufficiently removed from anything protected by the First Amendment that we must evaluate it as-applied. The question is thus whether the Calimlims were on notice that their conduct was illegal.

The presence of a *scienter* element to the offense makes the Calimlims' burden very difficult to carry. See *Screws v. United States*, 325 U.S. 91 (1945) (rejecting vagueness challenge to what is now 18 U.S.C. § 242 because it had a *scienter* requirement). "When the government must prove intent and knowledge, 'these requirements . . . do[ ] much to destroy any force in the argument that application of the [statute] would be so unfair that it must be held invalid[.]'" *Cherry*, 938 F.3d at 754 (quoting *Kolender*, 461 U.S. at 839) (other internal quotations omitted). Section 1589 contains an express *scienter* requirement. In addition, one of the three ways in which labor can be obtained criminally contains a second *scienter* requirement: "by means of any scheme . . . intended to cause the person to believe . . . ." 18 U.S.C. § 1589(2). Obtaining the services of another person is not itself illegal; it is illegal only when accompanied by one of the three given circumstances, and

the jury must find that the defendant knew that the circumstance existed.

Even if the Calimlims did not know for certain that they would be convicted, the language of the statute alerted them to what was prohibited. They knew that they were telling Martinez that if she did not do everything they asked, they would not send money back home for her. The Calimlims also knew that not sending money back home was, for Martinez, a "serious harm." The Calimlims also warned Martinez about her precarious position under the immigration laws, conveniently omitting anything about their own vulnerability. The jury was instructed on *scienter* and found conduct that met the definition.

The Calimlims further assert that a reader of the statute would think that only direct threats are forbidden. That is not, however, what it says. The statute does not specify that the "serious harm" be at the defendant's hand. It requires that the plan be "intended to cause the [victim] to believe that" that harm will befall her. 18 U.S.C. § 1589(2). This subsection describes a more indirect form of threat than that covered by § 1589(1), which criminalizes direct "threats of serious harm to . . . [the victim] or another person." Taken as a whole, the statute provides ample notice that it prohibits intentionally creating the belief that serious harm is possible, either at the defendant's hands or those of others.

We have found only one unpublished decision from a district court that has directly addressed this issue, and that court took the same approach that we have. See *United States v. Garcia*, 2003 U.S. Dist. Lexis 22088 (W.D.N.Y., Dec.

2, 2003) (unpublished). Our conclusion is, more importantly, consistent with the one that the Supreme Court reached in *Screws, supra,* and *Hill v. Colorado*, 530 U.S. 703, 732-33 (2000), which rejected vagueness challenges to statutes requiring *scienter*. The *Hill* Court reasoned that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications[.]" 530 U.S. at 733 (quotation omitted).

A statute may also be unconstitutionally vague when an ambiguity allows for arbitrary enforcement of the law beyond what Congress intended. A statute is vague in this sense when "[t]here is [a] lack of clarity . . . that would give law enforcement officials discretion to pull within the statute activities not within Congress' intent." *United States v. Collins*, 272 F.3d 984, 989 (7th Cir. 2001). With reference to § 1589, after the Supreme Court ruled that a similar statute involving involuntary servitude, 18 U.S.C. § 1584, prohibited only servitude procured by threats of physical harm, see *United States v. Kozminski*, 487 U.S. 931, 952 (1988), Congress enacted § 1589, see *United States v. Bradley*, 390 F.3d 145, 156-57 (1st Cir. 2004); see also 22 U.S.C. § 7101(b)(13) (rejecting the definition of coercion applied by *Kozminski*). The language of § 1589 covers nonviolent coercion, and that is what the indictment accused the Calimlims of doing; there was nothing arbitrary in applying the statute that way.

We turn, then, to the Calimlims' overbreadth argument. It is tempting to reject this for the simple reason that § 1589 penalizes conduct, whereas overbreadth is a doctrine

designed to protect free speech. See *Virginia v. Hicks,* 539 U.S. 113, 118 (2003). The Calimlims argue that they are focusing, however, on speech associated with the forbidden conduct. They speculate that, in the wake of their convictions, innocent employers who merely warn their workers about the consequences of illegal immigration or a potential loss of health insurance coverage could get caught up by this law. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)).

There are many problems with this argument. As we said, § 1589 does not criminalize any speech; it bans behavior that may involve speech. This blunts any overbreadth attack. See *id.* at 52-53 (noting that an unconstitutionally vague statute criminalizing "loitering," which may or may not involve speech and association, was not subject to an overbreadth attack). Because of the *scienter* requirement, any speech involved must be a threat or else intended to achieve an end prohibited by law.

To the extent that § 1589 raises First Amendment concerns, the *scienter* requirement limits the prohibited speech to unprotected speech. The Calimlims imagine many hypothetical innocent parties who might get swept up by the law. For example, they pose the case of a small employer who tells her employees that they must start paying a portion of their health insurance premiums or

face the loss of their health insurance benefits (surely a common situation in these times). This example does not advance their case for overbreadth, however, because this employer would not run afoul of the statute. This plan could not be a "scheme . . . intended to cause the [employee] to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm . . . ," 18 U.S.C. § 1589(2), because the employee could quit and change jobs. The employer is not procuring labor by means of this statement, only lower wages or a renegotiation of the employment contract. There is no reliance on fear consistent with an intended scheme. Irma Martinez did not have an exit option: because the threats in her case involved her immigration status, she could not freely work for another employer in order to escape the threatened harm. Indeed, had Martinez escaped, she could have informed the authorities about the Calimlims' own violation of the law forbidding employment of an undocumented worker. See 8 U.S.C. § 1324a(1) ("It is unlawful for a person . . . (A) to hire . . . for employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such employment. . . ."). The Calimlims' problem is the lack of connection between their case and that of the innocent employer they posit.

Taking their vagueness and overbreadth challenges together, the Calimlims are arguing that nothing they said or did to Martinez amounted to a threat. To the contrary, they urge, they meant her no harm and were only telling her these things in her best interest. Perhaps another jury might have accepted this story, but the one that heard

their case did not. The key to distinguishing this innocent
explanation from the facts of conviction, and the reason
why the record contains evidence supporting the jury's
verdict, lies in part in what they did not tell her: that they
knew how to set in motion the process that might have
resulted in a legitimate green card (specifically through
an I-140 form and a Department of Labor certification
program). A statement is a threat if a reasonable person
would believe that the intended audience would receive
it as a threat, regardless of whether the statement was
intended to be carried out. See, *e.g.*, *United States v. Fuller*,
387 F.3d 643, 646 (7th Cir. 2004) (threat to life of President);
*United States v. Hart*, 226 F.3d 602, 607 (7th Cir. 2000) (threat
of death with unknown object purported to be bomb
during bank robbery).

The evidence showed that the Calimlims intentionally
manipulated the situation so that Martinez would feel
compelled to remain. They kept her passport, never
admitted that they too were violating the law, and never
offered to try to regularize her presence in the United
States. Their vague warnings that someone might report
Martinez and their false statements that they were the only
ones who lawfully could employ her could reasonably be
viewed as a scheme to make her believe that she or her
family would be harmed if she tried to leave. That is all the
jury needed to convict. (Notably, the Calimlims did not
challenge the sufficiency of evidence supporting the
jury's findings of intent.)

Almost as an aside, the Calimlims also argue that the
"abuse of law" here is not an "abuse" at all: Martinez was

throughout the relevant time in the United States illegally and was thus subject to deportation. (The Calimlims once again conveniently overlook the fact that they themselves were also breaking the law by employing Martinez. See 8 U.S.C. § 1324a(1).) But the immigration laws do not aim to help employers retain secret employees by threats of deportation, and so their "warnings" about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process. See *Restatement (Second) of Torts* § 682. The warnings therefore fit within the scope of § 1589(3). In summary, as applied to the Calimlims' case § 1589 is neither vague nor overbroad.

### B. Jury Instructions

The Calimlims also challenge the instructions given to the jury on the forced labor count. They argue that the district court's instructions permitted them to be convicted for innocent warnings. This challenge depends, however, on the overbreadth argument that we have rejected. The Calimlims do not argue that the district court misstated the law—indeed, they concede that the court "fairly and accurately" summarized the statute. At best, they seem to be challenging the district court's use of its discretion in giving the instruction at all. The only reason they give why this might be an abuse, however, is that the statute permits conviction for innocent warnings—in short, it is overbroad.

In fact, the district court advised the jury that "[w]arnings of legitimate but adverse consequences or

credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute." The Calimlims complain that the court failed to define "legitimate but adverse consequences," but, in the context of the whole discussion, the meaning of that phrase is plain. This instruction effectively alerted the jury to the *scienter* that the Government had to prove beyond a reasonable doubt.

To the extent the Calimlims raise a challenge to the sufficiency of the evidence supporting the court's instruction to the jury, they argue that no reasonable jury would have convicted the Calimlims on the charges because there was no evidence of threats of violence or physical coercion. No objection was raised on this point at trial, so we review for plain error only.

We have already reviewed why this argument has no merit. Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion. See *Bradley*, 390 F.3d at 156 (stating that Congress believed *Kozminski* "mistakenly narrowed the definition of involuntary servitude by limiting it to physical coercion"). There was no error, plain or otherwise, in a jury instruction based on this understanding of the law. The jury instructions properly recited the law, alerted the jury to the potential complications involving *scienter*, and were based on sufficient evidence. We will not quibble with a district court's wording as long as it fairly summarized the law for the jury. See *United States v. Bailey*, 227 F.3d 792, 799 (7th Cir. 2000).

C.  Insufficient Evidence for Harboring Conviction

We next turn to the Calimlims' challenge to the evidence supporting their conviction for harboring an alien for private financial gain under 8 U.S.C. § 1324(a)(1). The statute provides for stricter punishments if the harboring occurs "for the purpose of commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(1)(B)(i). A challenge to the sufficiency of the evidence for conviction is reviewed "in the light most favorable to the government," *United States v. Albarran*, 233 F.3d 972, 975 (7th Cir. 2000); we uphold a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The Calimlims argue that Congress intended to punish smugglers and coyotes when it doubled the maximum penalty for harboring aliens for private financial gain. They portray themselves as innocent employers who simply bargained for mutual advantage. They struck a fair deal with Martinez for the value of her labor, they claim; they even go so far as to say that she enjoyed a fine lifestyle while she lived with them. Perhaps, they concede, they did take some advantage of the fact that she was present in the country illegally, but they blame the immigration system, not themselves, for that inequity. This was a fair deal, they conclude, from which they reaped no net financial gain.

This argument makes no sense. The Calimlims must have enjoyed some profit, at least on the margin, or else they would not have gone to the trouble of having a live-in

housekeeper whom they kept hidden, often through extraordinary measures, from all outsiders. They argue that the value of her labor was offset by 1) the price of her wages, room, and board, and 2) the risk of harboring her, and that the values all balance out. Even accepting this implausible argument and granting that the Calimlims might not have any reason to spend one *more* dollar on Martinez, they would still have a motive to spend *some* dollars on her: her labor came at a significantly lower price than a comparable American housekeeper. This is enough of a pecuniary motive by itself to prove financial gain, as we observed in *United States v. Fujii*, 301 F.3d 535, 539-40 (7th Cir. 2002).

In effect, by adding the risk of harboring Martinez into the equation the Calimlims are trying to pay in an illegal currency. The whole point of criminalizing the act of harboring for financial gain and punishing it more strictly is to remove the financial incentive for doing so. If the risk of harboring Martinez is removed from the equation, the transaction becomes very imbalanced: the value of Martinez's labor, priced at a fair market value, greatly outweighs the wages, room, and board the Calimlims furnished for her. The law cannot take cognizance of a portion of a transaction that it forbids.

Finally, the Calimlims' argument ignores the circumstances surrounding the so-called bargain. They assert that the bargain was fair and any advantage they enjoyed was attributable to Martinez's illegal status and the legal hobbles it placed on her. What they ignore is that they procured her illegal presence by manipulating her travel

with Jovito Mendoza, confiscating her passport, and never attempting to rectify her status. The Government even showed that the Calimlims possessed the very forms that would have permitted her to apply for legal status, but they never filed the forms or even told Martinez about them. The circumstances surrounding the imbalance in bargaining power were not inevitable; they were constructs of the Calimlims' own making that brought about a slanted and inequitable bargain.

This court cannot stand back and dignify this as a fair deal that resulted in no financial gain for the Calimlims. An above-board arrangement with a housekeeper whose immigration status was not in question would have cost the Calimlims a great deal more money. (Indeed, they could not have required one such person to work all of the hours that Martinez did, and so a fair comparison to the market would probably require looking at two or more substitutes.) By procuring Martinez's vulnerable status, driving a hard bargain, and paying with an illegal currency, they received a manifest benefit at a drastically reduced price. There was overwhelming evidence of financial gain, and an attempt to characterize it as something different seems cynical at best and outrageous at worst—and illegal in either case.

## II

Although that disposes of the Calimlims' appeal, there is more to this case. At the sentencing phase, the Government argued that the Calimlims' offense level for purposes of the Sentencing Guidelines should be increased under three

separate sections: commitment of another felony during the course of committing the crime of forced labor, U.S.S.G. § 2H4.1(b)(4); vulnerable victim, U.S.S.G. § 3A1.1(b)(1); and use of a minor to commit a crime, U.S.S.G. § 3B1.4. The district court rejected all three, and the Government has cross-appealed on the ground that this was error and that the overall sentences of 48 months each were unreasonable.

### A. "Any Other Felony" Enhancement

The Guideline that applies to forced labor convictions is U.S.S.G. § 2H4.1, which covers "peonage, involuntary servitude, and slave trade." It establishes a base offense level of 22, and identifies several "special offense characteristics," including one for another felony:

> (b)(4) If any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of:
>
>> (A) 2 plus the offense level as determined above, . . . .

See also U.S.S.G. § 2H4.1(b)(4), appl. n. 2. The Calimlims and the district court both took the position that all of their convictions were covered by § 2H4.1 and thus that there was no "other" felony offense that would support the enhancement.

This argument overlooks entirely the actual offenses for which the Calimlims were convicted: violations of § 1589

(forced labor) *and* § 1324(a)(1) (harboring an alien for private financial gain). The latter offense has its own sentencing Guideline, U.S.S.G. § 2L1.1. It is therefore "an[ ] other felony offense . . . other than an offense that is itself covered by [§ 2H4.1]." U.S.S.G. § 2H4.1(b)(4), appl. n. 2. The harboring conviction falls within the terms of § 2H4.1(b)(4) and should have triggered its application. "The bar on double counting comes into play only if the offense itself *necessarily* includes the same conduct as the enhancement." *United States v. Senn*, 129 F.3d 886, 897 (7th Cir. 1997) (emphasis in original).

There is nothing artificial about treating forced labor and harboring as two separate offenses. They are based on different conduct, and neither necessarily encompasses the other. See, *e.g.*, *Bradley*, 390 F.3d at 148-50 (listing charges of forced labor but not harboring of Jamaican nationals). To state the obvious, even today, long after the passage of the Thirteenth Amendment, it is possible to violate the law by forcing an American into servitude just as one can force an alien into servitude. In no sense does forced labor necessarily imply that the victim is an alien. Similarly, it is possible to harbor an alien for private financial gain without forcing that person to work; the gain might come from the use of valuable property that the alien has, or even from a ransom. The enhancement called for by § 2H4.1(b)(4) should have been applied here.

B. "Vulnerable Victim" Enhancement

U.S.S.G. § 3A1.1(b)(1) requires a two-level increase if the defendant "knew or should have known that a victim of

the offense was a vulnerable victim." The commentary accompanying this section defines a "vulnerable victim" as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, appl. n. 2. The question here is whether the vulnerability of the victim is to be measured against the general population or against the group comprised of the likely victims of this crime. If the former, Martinez is vulnerable, but if the latter (as the district court thought), then she is no worse off than any other victim of these crimes. In the latter case, the vulnerability of the victim would already have been built into the offense Guideline, and it would be double-counting to apply the enhancement.

Section 2H4.1, which as we have just noted is the Guideline for the forced labor offense, does not say anything about the vulnerability of the victim. The only adjustments it requires are for death or serious bodily injury, use of a dangerous weapon, a period greater than a year, and commission of another felony. The Ninth Circuit has held that the vulnerable victim adjustment is not part-and-parcel of the offense Guideline. *United States v. Veerapol*, 312 F.3d 1128, 1132-33 (9th Cir. 2002). We agree with our colleagues and find the Calimlims' argument to the contrary unpersuasive. The Calimlims assert, in essence, that any victim of forced labor is by definition vulnerable, and so a vulnerable-victim enhancement would be redundant. This is not the case: with enough muscle, it would be possible to coerce a perfectly able-bodied, English-speaking, independent American citizen into forced labor. The district court erred by failing to recog-

nize that there are more ways to commit the forced labor crime than the one the Calimlims chose.

The Calimlims also appeal to the Ninth Circuit's decision in *United States v. Castañeda*, 239 F.3d 978 (9th Cir. 2001), which held that only certain victims of a Mann Act violation would qualify as unusually vulnerable before the enhancement provided by U.S.S.G. § 3A1.1(b)(1) would be justified. The Calimlims argue that the same logic should apply to the forced labor statute: because all victims of that crime are vulnerable to a certain degree (or else no one could force them into servitude) only the subset who are worse off than most would warrant the vulnerable-victim enhancement.

In our view, this misinterprets *Castañeda*. *Castañeda* differentiated between victims of the particular scheme (for example, an offer of a bogus cure for cancer) and victims of the general offense (for example, health-care fraud); it permitted application of the enhancement when the victim was vulnerable in a way typical of the special scheme. See *id.* at 981 n.4. For example, somebody who uses mail fraud to victimize the aged should be punished more than a person who victimizes younger (and presumably more capable) people: the law recognizes that preying on the elderly is more culpable than many other instances of mail fraud. Even though Martinez may not have been especially vulnerable among the population of illegal aliens, she was among the most vulnerable of the broader group who are forced into labor. The Calimlims victimized her by targeting her special vulnerability.

In *Veerapol*, on facts very similar to those before us, the Ninth Circuit upheld the use of the vulnerable-victim

enhancement. See 312 F.3d at 1133. The approach to the enhancement taken by other circuits is consistent with that in the Ninth. See generally, *e.g.*, *United States v. Zats*, 298 F.3d 182 (3d Cir. 2002) (fraudulent debt collection scheme); *United States v. McCall*, 174 F.3d 47 (2d Cir. 1998) (embezzlement). We have described the key concern behind the vulnerable-victim enhancement as the desire to deter criminals from targeting certain groups by increasing the penalties for doing so. See, *e.g.*, *United States v. Newsom*, 402 F.3d 780, 785 (7th Cir. 2005); *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999); *United States v. Lallemand*, 989 F.2d 936, 940 (7th Cir. 1993). Lest there be any doubt about our position on the question raised by the Calimlims, we clarify today that where vulnerability is not already accounted for in the Guidelines, we will apply the vulnerable-victim enhancement when the victim is a member of a group typically vulnerable to the particular manifestation of the general offense committed by the defendant, whether or not the victim is otherwise unusually vulnerable. In this case, Martinez was a member of a group typically targeted by those desiring forced labor, but her group (illegal aliens) is only part of the broader set of possible victims. She was therefore a vulnerable victim for the purposes of U.S.S.G. § 3A1.1(b)(1). The district court erred when it denied this enhancement.

### C. "Use of Minor Children" Enhancement

Finally, U.S.S.G. § 3B1.4 requires a two-level enhancement for using a minor to commit a crime. "Use" includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting."

U.S.S.G. § 3B1.4, appl. n. 1. The district court thought that the Calimlims' minor children were not active and knowing cooperators in the scheme, but were rather innocent dupes of their parents.

A legal error lies behind this finding. Whether the minor understands what is going on is irrelevant: "The enhancement in section 3B1.4 focuses on whether the defendant used a minor in the commission of a crime, not whether the minor knew that he was being used to commit a crime." *United States v. Ramsey*, 237 F.3d 853, 861 (7th Cir. 2001). The district court erred when it relied on the children's (lack of) knowledge as the reason not to apply this enhancement.

The Calimlims' discussion of *United States v. Acosta*, 474 F.3d 999 (7th Cir. 2007), is wide of the mark. In *Acosta*, this court vacated the application of the enhancement because the defendant did not personally use a minor in committing the crime, even though he was aware of the minor's participation. *Id.* at 1003. The emphasis there was on the fact that the defendant did not *personally* solicit, encourage, or otherwise facilitate the crime; someone else in the conspiracy did. The *Acosta* court affirmed the defendant's conspiracy conviction, but it refused to enhance the sentence based on use of the minor. *Id.* The Calimlims frame this as a holding that the defendant must affirmatively use the child in order to warrant the enhancement. They then leap to an equation of the term "affirmatively use" with a requirement that the *child* know what is going on. The one does not follow from the other. The district court erred in not applying the enhancement, based

on the ample evidence in the record that the Calimlims used their children to help conceal Martinez and to keep her in bondage all those years.

### D. Reasonableness of Sentences

At this point, we do not need to explore the reasonableness of the Calimlims' sentences because a remand for a proper Guidelines calculation is necessary in any event. See *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006) ("When a judge does not properly calculate a guidelines sentence, our review for reasonableness is forestalled."). Once the proper range has been determined, rather than thinking in terms of "departures" and "enhancements," the court should simply "decide whether to impose a sentence within the range or outside it, by reference to the factors set forth in 18 U.S.C. § 3553(a)." *Id.*

### III

We AFFIRM the Calimlims' convictions, but VACATE their sentences and REMAND for resentencing in accordance with this opinion.