**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2198**

WINFRED MUCHIRA,

                    Plaintiff – Appellant,

            v.

HALAH AL-RAWAF; IBRAHIM AL-RASHOUDI; FAHAD AL-RASHOUDI;
LULUH AL-RASHOUDI,

                    Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Anthony J. Trenga, District Judge.  (1:14-cv-00770-AJT-JFA)

Argued:  October 27, 2016                          Decided:  March 2, 2017

Before WILKINSON and TRAXLER, Circuit Judges, and Bruce H. HENDRICKS,
United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion.  Judge Traxler wrote the opinion, in which Judge
Wilkinson and Judge Hendricks joined.

**ARGUED:** Gregory H. Lantier, WILMER CUTLER PICKERING HALE AND DORR
LLP, Washington, D.C., for Appellant.  Neil Harris Koslowe, POTOMAC LAW
GROUP, PLLC, Washington, D.C., for Appellees.  **ON BRIEF:** James L. Quarles III,
Robert Arcamona, Thomas G. Sprankling, WILMER CUTLER PICKERING HALE
AND DORR LLP, Washington, D.C., for Appellant.  Galia Messika, Luisa Caro,
POTOMAC LAW GROUP, PLLC, Washington, D.C., for Appellees.

TRAXLER, Circuit Judge:

Winfred Muchira ("Muchira") appeals from the district court's grant of summary judgment in favor of defendants-appellees Halah Al-Rawaf ("Halah"), Ibrahim Al-Rashoudi ("Ibrahim"), Fahad Al-Rashoudi ("Fahad"), and Luluh Al-Rashoudi ("Luluh"), on Muchira's claim that the defendants forced her to provide labor in violation of the Trafficking Victims Protection Act of 2000 ("TVPA"). *See* 18 U.S.C. § 1589. We affirm.

I.

A.

Muchira is from a small village in Kenya. She grew up in poverty and did not progress beyond the eighth grade in her formal education. Nevertheless, she is proficient in reading and writing English. As an adult, Muchira assisted her mother and siblings financially by working as a housemaid for private families and in housekeeping services for a Kenyan hotel. In 2010, Muchira's pastor offered her the opportunity to work as a live-in housemaid for a family in Saudi Arabia at a salary of 1300 Saudi Riyals (approximately $350 U.S. dollars) per month. Muchira was 32 years old at the time. After speaking with Defendant Ibrahim, an adult son of the Saudi family, Muchira accepted the offer.

In December 2010, Muchira traveled from Kenya to Saudi Arabia, where she signed her employment contract and began her employment. However, she soon became unhappy with her working hours and conditions. She and two other housemaids worked long hours, seven days a week, cooking and cleaning for three separate households of the

2

Saudi family. They were also expected to comply with a number of cultural "house rules" that were traditionally applicable to domestic employees in Saudi Arabia. For example, they were not allowed to sit down or take breaks during work hours. They were not allowed to leave the Saudi family homes unless accompanied by a member of the family, and they were not allowed to speak to or interact with the Saudi family's neighbors. Muchira testified that they would receive verbal reprimands if they violated these rules. The Saudi family also maintained possession of their foreign employees' passports, unless needed for travel or other legal matters. Muchira worked for the Saudi family in Saudi Arabia for approximately seventeen months under these conditions.

In May 2012, the Saudi family purchased a ticket for Muchira to return to Kenya to visit her sick mother. While there, Muchira decided not to return to her employment in Saudi Arabia. However, Muchira changed her mind about leaving the Saudi family when they offered her the opportunity to work in the United States for the mother of the family, Defendant Halah, while three of Halah's children attended school in this country. Muchira was excited about the opportunity to come to this country and she hoped that her workload would be lighter because she would only be responsible for one household. After receiving verbal assurance from the Saudi family that she would be allowed to attend Christian church services in the United States, Muchira accepted the employment offer and returned to Saudi Arabia.

On June 7, 2012, Muchira reviewed the terms of her written employment contract with Halah to work as her housemaid in the United States. Muchira's employment would "start[] the same day of [the employee's] arrival [in] the United States upon the request of

3

the employer and end[] when the employee leaves the United States." J.A. 790. Halah represented that she would "not ask [Muchira] to remain on the premises of the Employer's residence or workplace after working hours without compensation," that she would not "withhold the passport of [the] Employee while in the United States," and that she would "treat the Employee in a fair and humane way." J.A. 791. Halah also agreed to provide Muchira with all necessary transportation, plus airfare to and from the United States, and to pay her medical costs. Muchira agreed "not [to] accept any other employment with a third party while in the United States." J.A. 792.

With regard to Muchira's pay, the written employment contract provided for a salary of $1600 per month - $10 per hour for 40 hours per week (Monday through Friday) - plus overtime at the rate of $15 per hour. However, Muchira testified that the Saudi family verbally informed her, before she applied for her visa and traveled to the United States, that she would only be paid $400 per month in cash – more than her prior salary in Saudi Arabia but substantially less than the amount represented in the employment contract – because they would also be paying for her room, board, and clothing. Muchira testified that she agreed to the $400 pay provision. J.A. 357. Muchira also testified that the Saudi family told her that she would have to affirm the pay term in the employment contract if asked. Muchira understood and agreed to do so. According to Muchira, "I had a right to lie" to the Embassy official "[be]cause . . . if I refuse, it could not help me. . . . They [were] going to get another house girl and go with her." J.A. 355.

Although the Saudi family members and Muchira went together to the United States Embassy in Saudi Arabia to apply for their visas, Muchira was privately

4

interviewed by a United States Embassy official while there. Muchira confirmed to the Embassy official that she was to be employed by the Saudi family pursuant to the terms of the written employment contract, but she was not specifically asked about the pay provision. Muchira was granted a 6-month visa to work for Halah in the United States. Under the terms of Muchira's visa, she was not permitted to seek or engage in any other employment while in the United States. If she left employment with the Saudi family, United States immigration laws and the terms of her visa required her to return to Kenya. Before she left, the Embassy official gave Muchira a pamphlet that included the National Human Trafficking Resource Center ("NHTRC") Hotline number. Muchira was told to call the Hotline if she was mistreated in any way. Muchira took the NHTRC pamphlet with her to the United States, and it remained in her possession the entire time that she worked for the Saudi family.

Defendant Halah and her three children also obtained 6-month visas to live in the United States while the children attended school. Defendant Luluh (an adult daughter) and Defendant Fahad (an adult son) would attend college in Washington, D.C. A second minor daughter would attend a high school in Virginia. Defendant Ibrahim was involved in the visa application process in Saudi Arabia, and he later visited the family in the United States.

B.

In July 2012, Muchira, Halah, and the three children traveled from Saudi Arabia to the United States. Muchira testified that she came voluntarily. For the first three months of their stay in the United States, the Saudi family leased a one-bedroom private

5

apartment for Muchira on the fourth floor of an apartment building and a three-bedroom apartment for the family members on a lower floor in the same complex. Muchira was given the key to her apartment and she was not physically restricted in her ability to come and go from it. Muchira testified that she did not know anyone in the United States at the time, but that she did occasionally venture outside unaccompanied to walk and jog in the parking area.[1]

In October 2012, the Saudi family leased a four-bedroom, four-bathroom home in a 15-home subdivision in Vienna, Virginia, from Nick Nobakht. The home was located across the street from several public places, including a convenience store and a car wash. The Reston Zoo and several Christian churches were also within walking distance. Muchira was provided with a private, furnished bedroom with a walk-in closet and full bathroom on the basement level of the Vienna home, which Nobakht testified he used for guests when he and his wife lived in the home. There was also a media room and kitchenette in the basement. A door near Muchira's bedroom opened directly from the basement to the back yard. The rest of the family bedrooms and the living areas were on the upper floors. The only complaints Muchira voiced about her living conditions were that the Saudi children sometimes kept her awake when they used the media room and that her bedroom was too cold. The main level and basement level of the Vienna home were controlled by a single heating unit. After Muchira continued to complain about the

---

[1] For a short time, Fahad lived in the one-bedroom apartment and Muchira was given a private bedroom in the three-bedroom apartment. However, Muchira and Fahad switched their living quarters because the Saudi family got up early and Fahad was responsible for driving himself and his siblings to school.

temperature, the Saudi family purchased a space heater for her to use in her bedroom. During the five months that Muchira lived with the family in the Vienna home, Nobakht visited on several occasions and was introduced to Muchira. Nobakht testified that Muchira seemed happy and normal, her living conditions were good, and he observed nothing out of the ordinary. It seemed to him that Muchira was more of a companion for Halah while the children were at school than an employee of the family.

When they arrived in the United States, Muchira gave Halah her passport, just as she had done in Saudi Arabia. Muchira testified that she did not know where the Saudi family kept the passports, but she did not ask where they were kept or tell the family that she wanted to keep her own passport. Muchira testified that she and Halah did not discuss whether and to what extent the Saudi cultural "house rules" applied in the United States, but Muchira assumed that they still applied and she acted accordingly.

The Saudi family also obtained a vehicle when they arrived in the United States, but neither Halah nor Muchira were licensed to drive. Fahad took Halah and Muchira to a local bank so that Muchira could open a bank account in her name. Muchira testified that the Saudi family paid for her food, clothing, and entertainment, and she sent most of her $400 in pay to her family in Kenya. The Saudi family would give Muchira her passport and drive her to a Western Union or MoneyGram when she wanted to wire money to her family, after which Muchira would return her passport to the family. Although it is unclear exactly how much money Muchira was actually paid during her eight months of employment in the United States, the wire records indicate that Muchira sent more money to her family than a $400 salary would have allowed. Muchira testified

7

that the Saudi family occasionally gave her extra money when she worked extra hours, such as when the Saudi family had visiting relatives or guests. They also added additional money to the amount she was sending to her family as a gift on one or two occasions, and they would pay the wire transaction costs.

The Saudi family also provided Muchira with a cell phone with Internet access. Muchira testified that she was given the cell phone so that the Saudi family members could call her when she was in her apartment and, later, in her bedroom in the Vienna home. However, she also used the cell phone to communicate with her family and friends in Kenya as well as with several Kenyan nationals living in the United States, including Rose Ngigi in Alabama, Jane Maturi in Texas, and Pastor Carl Kihato in Boston, who was a friend of Muchira's brother.

The Saudi family offered to set up a Skype account for Muchira, so that she could video chat with her friends and family, but she declined. Luluh assisted Muchira in setting up a Facebook page, to which Muchira regularly posted status updates and photographs, including posts and photographs documenting her outings and trips with the Saudi family. During the eight months that she worked for the Saudi family in the United States, Muchira was occasionally invited to accompany the family to dinner at restaurants. She was also included in a family outing to a shopping center and skating rink in the District of Columbia, on a trip to Kings Dominion Amusement Park in Doswell, Virginia, and on a family vacation to New York City, where she shopped, went to Central Park, and went on a carriage ride. Muchira testified that the Saudi family would sometimes give her a small amount of extra spending money on these trips.

Although Muchira was included in the family activities and admittedly had fun on these outings, she was expected to assist the family as an employee and was occasionally left alone while the Saudi family members did other things.

Muchira also posted pictures and messages about her walks and jogs, as well as her church attendance. On two occasions, Muchira took a photograph of her passport before returning it to the family, one of which she posted on Facebook. Muchira testified that she carried her cell phone in her pocket while she was working so that she could view posts and chat with her Facebook friends during the day, although she made efforts to hide this from Halah during working hours. All told, Muchira exchanged approximately 15,000 public and private messages with friends and family during the eight months that she worked for the Saudi family in the United States, the majority of which related how positive and happy she was with her experiences in this country. However, Muchira claims that many of her posts and messages were lies and fabrication on her part, designed to impress her friends and family and to hide her disappointment with her employment situation in the United States.

Although Muchira had hoped otherwise, her working hours and conditions were only somewhat better than what she had experienced as a housemaid in Saudi Arabia. Muchira had only one family home and four family members to attend to in the United States on a regular basis, but she did not have the assistance of the other two housemaids employed by the family in Saudi Arabia. As in Saudi Arabia, Muchira also did not have a specific schedule or set working hours. She would usually awake at 6:30 or 7:00 in the morning, shower and dress in her uniform, and begin her workday. Because Halah's

9

three children were in school during the week, Halah and Muchira were alone in the home for most of Muchira's work hours. Muchira's primary job duties were to clean the home, make the beds, do the laundry and ironing, and take out the trash. She accompanied Halah to grocery shop and brought in the shopping bags. Although Muchira was not expected to cook for the family, she helped Halah prepare dinner, and she made sandwiches for the children when asked. Muchira would also make tea for Halah throughout the day and would occasionally sit with Halah outside while Halah smoked and drank her tea. Although Muchira's testimony was largely nonspecific, it appears that she generally worked or was subject to be asked to assist the family from approximately 10:00 a.m. until 11:00 p.m., seven days a week, but it varied from day to day and "sometimes [the family] went [on] vacation." J.A. 288. Muchira was also allowed to take small work breaks during the day, including a lunch break.

Although Muchira admitted that she went out alone when she lived in her apartment, and was occasionally left alone by the family in public during their outings, Muchira testified that she never left the Vienna house unaccompanied by a family member and that her Facebook posts to the contrary were untrue. Muchira testified that she "knew the rules in the house as a housemaid" from her time in Saudi Arabia, and she "understood" that these restrictions continued to apply in the United States. J.A. 293-94. According to Muchira, even if she had asked to go out unaccompanied, she "did not know where to go." J.A. 320. Muchira also testified that the Vienna home had an alarm system that was set at night and when the family was away, but not during the day. Muchira testified that the "alarm was like their lock," but admitted that she never asked

10

for the alarm code and that the doors were never locked from the inside so as to keep her from walking out. J.A. 324.

Muchira was particularly disappointed because the Saudi family was failing to abide by their verbal promise to allow her to attend Christian church services in the United States. Muchira admits that Luluh helped her find churches within walking distance that Muchira could attend, but she testified that the Saudi family would offer excuses every Sunday morning as to why they would not take her to services. Although Muchira represented otherwise in her Facebook posts and during her conversations with her friends, Muchira testified that these were also lies on her part and that she never attended church services in the United States.

Finally, Muchira testified that Halah and Luluh continued to verbally reprimand or abuse her when she made mistakes in her job. Muchira's testimony in support of this claim, however, was largely nonspecific. Muchira related two occasions when Halah verbally reprimanded her for talking on the phone when she was supposed to be working. On one of these occasions, Halah "yell[ed]" at her for "leaving . . . things in the bathroom" and "not collecting the towel that you are using because you're always on [the] phone," and Muchira "yelled [back] at her and could ask her, ['A]m I not supposed to talk to my family[?']" J.A. 278. When Muchira was specifically asked to recount "the worst thing" that the Saudi family "ever did to [her] while [she was] living in the United States," Muchira responded that they "ma[de] [her] overwork while I was alone," "den[ied] my rights to my contract salary," and "den[ied] me my contract agreement that

11

they [were] going to be taking me to church." J.A. 286.[2] Muchira admitted, however, that she never asked the family to reduce her work hours and never asked the family if she could walk to the nearby church services alone. She also never asked to terminate her employment and return home to Kenya, and she was never threatened by the Saudi family with any adverse consequences if she tried to leave.

C.

In December 2012, the Saudi family retained the services of a United States law firm to extend their original 6-month visas so that they could remain in the United States through the spring semester of 2013. Muchira signed a new employment contract with Halah to continue her employment in the United States. The contract maintained the $1600-per-month pay provision, and set forth specific working hours from 10:00 a.m. to 6:00 p.m., Monday through Friday. The contract provided that it was "understood . . . that Ms. Muchira w[ould] reside on the premises" of the Vienna home with the family, and that she would "be provided with a private room and board at no cost." J.A. 951. However, Muchira was "free to leave the premises at all other times except that she may work overtime if paid at $40 per hour." J.A. 951. The employer remained "responsible for her medical bills, clothing, housing and transportation to enter the United States, during her visit in the United State[s] and her transportation to return to Saudi Arabia."

---

[2] Muchira also complained that the Saudi family refused to take her to the hospital emergency room when she felt sick, and that Halah would instead tell her to wait for Fahad to come home to give her medication. There is some indication in the record that Fahad was a physician educated in Saudi Arabia. But in any event, Muchira was unable to specify a single, specific occasion when she needed to go to the hospital and was refused.

12

J.A. 951. Muchira testified that she signed this contract as well, but did not read it. She testified that the Saudi family told her to sign the papers, and she "thought all was well." J.A. 233-34.

In January 2013, the attorney filed an application for an extension of Muchira's nonimmigrant status to June 27, 2013. Muchira's signed affidavit was attached, stating that Halah had "requested an extension of [Muchira's] stay to care [for Halah's] daughter" until "the end of the school year," and that they "w[ould] return to Saudi Arabia when [the] daughter finishes school." J.A. 894. Muchira represented that she "ha[d] no intention to stay in the United States and . . . every intention to abide by the U.S. immigration laws." J.A. 894. A flight itinerary, dated December 24, 2012, was also attached, documenting that Muchira had a return flight to Saudi Arabia on June 8, 2013.

Muchira testified that she did not sign the visa extension documents, but she admits that the Saudi family informed her of their plans to extend their visas to June 2013, and to return to Saudi Arabia at that time. Muchira testified that the Saudi family did not "force [her] to stay" in the United States after her initial 6-month visa expired, but she complains that they effectively did so by "prolong[ing] [her] staying with them in America" without her consent. J.A. 220. However, Muchira also testified that, when she became aware of the plan to extend their visas and return to Saudi Arabia in June, she "talked to [Halah] and . . . *refused* to go to Saudi Arabia" directly from the United States, J.A. 728 (emphasis added), and that Halah "agreed [that she could] go to Kenya and stay . . . with [her] family" instead. J.A. 220. The Saudi family then purchased Muchira an

airline ticket for her to travel directly to Kenya on May 22, 2013, and a follow-up ticket for her to travel from Kenya to Saudi Arabia on June 7, 2013.

In mid-March, 2013, Muchira sent a Facebook message informing a Kenyan friend that she would be returning to Kenya on May 22. *See* J.A. 728 (Muchira's testimony that "after negotiating with the family [in] December," she sent a message to a Facebook friend that she "would be returning to Kenya on May 22nd"). Muchira has never claimed that she informed Halah that she wanted to terminate her employment and return to Kenya immediately, or that she wanted to return to Kenya when her original 6-month visa expired.

D.

By December 2012, Muchira had became acquainted with Rose Ngigi, a Kenyan national from her village who was living in Alabama. Ngigi obtained Muchira's cell phone number from a mutual friend of their families in Kenya, and she and Muchira began to converse regularly. Muchira complained to Ngigi about her long work hours, restrictive living conditions, and pay discrepancy, and she told Ngigi that she wanted to obtain a different job in the United States. Ngigi encouraged Muchira to call the NHTRC Hotline number for assistance.

On March 13, 2013, approximately two months before her scheduled departure to Kenya, Muchira called the Hotline number. Over the course of several telephone calls, Muchira informed the Hotline operator that she had agreed to come to the United States to work as a domestic employee for a Saudi Arabian family, that she was not being physically abused or threatened, and that she did "not wish to report her employers as she

14

d[id] not feel that they [we]re mistreating her." J.A. 954. However, she complained that she "was required to do a lot of work" and that she was only being paid $400 per month instead of the $1600 per month that was provided for in her employment contract. J.A. 954. Muchira also told the Hotline operator that the family was "in control of her documents." J.A. 954. Muchira informed the Hotline operator that the Saudi family would be returning to Saudi Arabia in May 2013, and she would "either have to work for them or return to Kenya." J.A. 954. She told the operator that she "would like to get a new job" and leave her current employment when the Saudi family left in May. J.A. 954. She also requested assistance to relocate to Alabama (where Ngigi lived). The Hotline operator explained that the NHTRC could not "assist [her] in finding a job," but could "provide referrals that [could] potentially assist her in understanding her rights and seeing what her options are." J.A. 954. The Hotline operator took Muchira's contact information and later provided her with several such referrals. Muchira does not deny that she told the Hotline operator that she wanted to stay in the United States and get a different job, but she testified that this was not the main purpose of her call. She wanted to "escape" so that she would not have to continue working for the family in Saudi Arabia or in the United States.[3] J.A. 958.

---

[3] According to the Hotline records, Muchira told them that "she is not forced to stay" with the family, "but she does not want to stay with them." J.A. 958. She told them that she "will be forced to leave with [the family] to go to Kenya . . . and does not want to go." J.A. 958. In other words, she "want[ed] to escape," but remain in the United States. J.A. 958.

15

On March 29, 2013, Muchira informed the Hotline operator that the Saudi family was out of town and that she was ready to leave, but that the Saudi family had her passport and she did not know how to disable the home alarm system. The Fairfax County police department was dispatched to assist Muchira. After some delay and assurances that she would not be arrested, Muchira walked out of the front door of the Vienna residence with her suitcases and triggered the house alarm. Muchira testified that she had not contacted the Hotline earlier because she was "scared" that the family would "get upset." J.A. 366. When asked what she thought "would happen if they got upset," however, Muchira testified that she had "no good reason" or "good answer for that." J.A. 366.

The Saudi family unsuccessfully attempted to contact Muchira via her cell phone when they were notified of the alarm signal, but Muchira had been instructed not to answer. The family also contacted Nobakht to check on her. When they returned home, the Saudi family contacted local hospitals and the police. They told the police that their alarm had been triggered, that Muchira was missing, and that they were "afraid something may have happened to her." J.A. 817. The police informed the Saudi family that that they could not file a missing-persons report because there was no reason to believe that Muchira was in danger, but the Saudi family was not told of the police department's involvement in her leaving the home. Luluh also attempted to contact Muchira by Facebook, but got no response. J.A. 914 ("Hey [W]innie how are you? Hope everything is ok? We are very worried please call us."). There is no evidence that the Saudi family made an effort to intimidate Muchira or coerce her to return. When the

16

Saudi family learned that Muchira was safe and had left their employment, they delivered Muchira's passport to the Kenyan Embassy.

After leaving the Saudi family's home, Muchira was interviewed by officials with the Immigration and Customs Enforcement, Homeland Security Investigations, an Assistant United States Attorney, and the Fairfax County police officer who had assisted Muchira, in connection with a joint investigation of Halah for "Visa Fraud," in violation of 18 U.S.C. § 1546. During the interview, Muchira confirmed that she "change[d] her mind about leaving the family" when she was in Kenya, and that she voluntarily returned to Saudi Arabia when she was offered the opportunity to work for Halah in the United States. J.A. 182. Muchira also confirmed that "Ibrahim told her . . . to tell the U.S. Embassy that she would be earning $1600" per month, but that "she agreed to . . . receiving the $400 [per] month" in pay before she came to the United States "because she [would be] getting a good bedroom and bathroom" as well. J.A. 182. Muchira was granted a "T-Visa," which allowed her to remain and work in the United States while the investigation was ongoing. *See* 8 U.S.C. § 1101(a)(15)(T)(i)(I).

II.

On June 23, 2014, Muchira brought this action against Halah and her three adult children (Ibrahim, Fahad and Luluh), alleging six claims of involuntary servitude and illegal trafficking under the TVPA. Specifically, Muchira alleged that she was a victim of: (1) involuntary servitude, in violation of the Thirteenth Amendment to the United States Constitution and 18 U.S.C. § 1584; (2) trafficking with respect to peonage, slavery, involuntary servitude, or forced labor in violation of 18 U.S.C. § 1590; (3) forced labor,

17

in violation of 18 U.S.C. § 1589; (4) involuntary servitude in violation of 18 U.S.C. § 1584; (5) unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor, in violation of 18 U.S.C. § 1592; and (6) benefitting financially from trafficking in persons, in violation of 18 U.S.C. §§ 1593A.

Muchira brought an additional claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(f)(1), alleging that the Saudi family failed to pay her the legal minimum wage for employees in domestic service, and four claims under Virginia state law for false imprisonment, intentional infliction of emotional distress, unjust enrichment, and civil conspiracy to accomplish human trafficking, peonage, and unjust enrichment or to benefit financially from Muchira's services through these unlawful means. The Saudi family denied the material factual allegations set forth in Muchira's complaint, including, but not limited to, Muchira's claims that she was prohibited from leaving the Saudi home unaccompanied by a family member, that she was paid less than the $1600 provided for in the employment contracts, and that she was verbally abused while in their employ.

Pursuant to the TVPA's mandatory stay provision, 18 U.S.C. § 1595(b), the district court stayed Muchira's civil action pending resolution of the criminal investigation. The stay was lifted on February 6, 2015, after the Department of Justice confirmed that it had closed its investigation and would not be initiating a criminal prosecution against the defendants. Following discovery, the Saudi family sought summary judgment on all of Muchira's claims with the exception of her FLSA wage

18

claim, acknowledging that there was a material dispute of fact as to Muchira's actual working hours and pay.

In April 2015, the district court granted summary judgment to the Saudi family on all of Muchira's trafficking and involuntary servitude claims, and granted summary judgment on her state law claims for false imprisonment, intentional infliction of emotional distress, and civil conspiracy insofar as that claim was predicated upon her trafficking and involuntary servitude allegations. Muchira's remaining FLSA claim and her state law claims for unjust enrichment and civil conspiracy to unjustly enrich -- all of which related to her allegation that the Saudi family had unlawfully withheld wages to which she was entitled under the terms of her employment contract and the minimum wage laws -- were subsequently settled by the parties.

On appeal, Muchira challenges only the district court's grant of summary judgment on her claims that she was a victim of "forced labor" in violation of 18 U.S.C. § 1589. "We review the district court's grant of summary judgment de novo, viewing the facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a properly filed motion for summary judgment, the nonmoving party must set forth specific facts that go beyond the "mere existence of a scintilla of evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Conclusory allegations and speculation will not suffice. *See Thompson v. Potomac Elec. Power Co.*,

19

312 F.3d 645, 649 (4th Cir. 2002). "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.[4]

III.

Under the forced labor provision of the TVPA, "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means," shall be guilty of a crime:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

---

[4] As noted by the district court, the record in this case is rife with materially conflicting statements by or attributed to Muchira. For example, Muchira contradicted Ngigi's affidavit in several important respects, including whether she had ever attended church services in the United States. Ngigi testified that Muchira told her that the Saudi family allowed her to go to church once or twice, and then stopped letting her go. Muchira testified that she was never allowed to go to church and that she had lied to Ngigi when she said otherwise. Muchira also contradicted the contemporaneously prepared Hotline records that attributed certain statements to Muchira about her work conditions and her ability to come and go from the Saudi family home. And, as we have noted above, Muchira testified that many of her Facebook posts and messages, also pertaining to her church attendance and freedom in the United States, were lies on her part. The greatest difficulty presented by the summary judgment record, however, involves serious inconsistencies that exist between a Declaration that Muchira signed in support of her application for her T-Visa in June 2014 (but which the record indicates she may not have read before signing it), and her deposition testimony in January and February of 2015. Because the Declaration preceded her deposition testimony, we rely upon Muchira's testimony.

20

18 U.S.C. § 1589(a). Section 1589 was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014). "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion," as well as through "physical or legal coercion." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (internal quotation marks omitted); *see also United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) ("Section 1589 is not written in terms limited to overt physical coercion, and we know that when Congress amended the statute it expanded the definition of involuntary servitude to include nonphysical forms of coercion."). The TVPA is primarily a criminal statute, but "[a]n individual who is a victim of a [trafficking or involuntary servitude] violation may [also] bring a civil action against the perpetrator" for "damages and reasonable attorneys fees." 18 U.S.C. § 1595.

On appeal, Muchira claims that she has presented sufficient evidence upon which a jury could find that the Saudi family knowingly obtained her labor and services "by means of serious harm," in violation of § 1589(a)(2), and "by means of the abuse or threatened abuse of law or legal process," in violation of § 1589(a)(3). Drawing all reasonable inferences in favor of Muchira, we agree with the district court's determination that Muchira's evidence is insufficient to satisfy the requirements of the forced labor statute and that the Saudi family was entitled to summary judgment as a matter of law.

A.

21

We begin with Muchira's claim that she has presented sufficient evidence to create a genuine issue of fact that the Saudi family "knowingly . . obtain[ed] [her] labor or services" in the United States "by means of serious harm or threats of serious harm." 18 U.S.C. § 1589(a)(2).

1.

Serious harm, for purposes of § 1589(a)(2), is defined as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services *in order to avoid incurring that harm.*

18 U.S.C. § 1589(c)(2) (emphasis added). Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *Dann*, 652 F.3d at 1170 (emphasis added) (internal quotation marks omitted). The harm or threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain*" in her condition of servitude when she otherwise would have left. *Id.* (emphasis added); *see also United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (holding that jury was properly instructed "to consider whether as a result of [defendant's actions and threats], the [victim] continued to provide labor or services where, if [defendant] had not resorted to these unlawful means, the person would have declined to perform additional labor or services" (internal quotation marks omitted)).

In addition, "[s]ection 1589 contains an express *scienter* requirement." *Calimlim*, 538 F.3d at 711. There must be evidence from which the jury could find "that the employer *intended* to cause the victim to believe that she would suffer serious harm-- from the vantage point of the victim--if she did not continue to work." *Dann*, 652 F.3d at 1170 (emphasis added). "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her" if she left her employment. *Id.*

When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, we must also "consider the particular vulnerabilities of a person in the victim's position." *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015). But "[t]he correct standard is a hybrid." *Id.* It also requires that the victim's "acquiescence be *objectively reasonable* under the circumstances." *Id.* at 186-87 (emphasis added). "The test of undue pressure is an objective one, asking how a reasonable employee would have behaved." *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005). "[T]o rely upon some hidden emotional flaw or weakness unknown to the employer would raise various problems (*e.g.*, scienter). But . . . known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigration status) bear on whether the employee's labor was obtained by forbidden means." *Id.* (internal quotation marks and alteration omitted).

Typically, therefore, "forced labor" situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the

outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors." *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015); *see, e.g., Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (reversing district court's dismissal of plaintiff's claims under the TVPA as time-barred under Rule 12(b)(6), where plaintiff, who spoke limited English, "alleged that the defendants confiscated her passport, isolated her from other people, monitored her communications, and threatened that she would be imprisoned and deported if she tried to escape."); *Rivera*, 799 F.3d at 183 (affirming conviction where defendant lured undocumented aliens to the United States with the promise of a decent salary and free transportation to work as waitresses in the defendants' bars, but later subjected them to a "reality [that] was very different"; defendants "threatened the victims with violence and deportation if they spoke to the authorities or quit, forced them to drink alcohol until they were intoxicated, required them to strip, and compelled them to be fondled [and] groped by customers, and to have sex with customers"); *Kalu*, 791 F.3d at 1197-99 (affirming conviction where defendant tricked foreign nationals into coming to the United States to work as specialized nurse instructors and supervisors at a university, charged them a fee for this service, but later "required them to work as non-specialized laborers in nursing homes, retained a portion of their wages for personal profit, and threatened them with deportation and financial ruin if they did not comply with his demands"); *United States v. Campbell*, 770 F.3d 556, 559 (7th Cir. 2014) (defendant

24

convicted of forced labor where he enticed young women to work for him as masseuses, with no requirement that they perform sexual services, by gaining their trust and offering them comfortable places to live, and subsequently required them to break all ties with their families and friends, "confiscated their identification [and] immigration documents," "renamed them, branded them with tattoos, abused them, and forced them to engage in prostitution"); *Dann*, 652 F.3d at 1163-69 (affirming conviction where employer brought non-English-speaking employee to the United States under a fraudulently obtained visa, confiscated her passport, forbade her from leaving the house or speaking to anyone outside the home, never paid her despite promise to do so prior to bringing her to the United States, forced her to sleep on the floor in a corner of the living room, rationed her food, falsely accused her of stealing, claimed that she was in substantial debt to the employer, threatened her with her illegal status, threatened to report her to authorities, and told her she had no rights in the United States); *United States v. Sabhnani*, 599 F.3d 215, 224-32 (2d Cir. 2010) (affirming forced labor convictions where victims, who did not speak English and did not know how to drive or use a telephone, were, among other things, brought into the United States illegally, forced to sleep on the floor, dressed in rags, provided inadequate food, and threatened with arrest); *see also Toviave*, 761 F.3d at 629-30 (discussing and comparing cases).

## 2.

Muchira admits that she came to the United States willingly. The Saudi family never physically abused her, nor did they ever threaten her or her loved ones with physical harm. They never physically restrained or impeded her from leaving her

25

employment situation. They never threatened her with arrest, deportation, adverse immigration consequences, or other legal consequences if she left their employment. Rather, Muchira's "forced labor" claim is based solely upon her assertion that the Saudi cultural "house rules," coupled with her long work hours and verbal reprimands, caused her to experience serious psychological harm in the form of depression, acute stress, and panic attacks, and that this evidence is sufficient to prove a "forced labor" violation by means of serious psychological harm within the meaning of § 1589. We disagree.

Muchira misapprehends the scope of the forced labor statute. "[N]ot all bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor." *Dann*, 652 F.3d at 1170; *cf. Toviave*, 761 F.3d at 629 (noting that "we should not--without a clear expression of Congressional intent--transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime"); *Bradley*, 390 F.3d at 155 (noting distinction between "merely abusive employers" and employers who "deliberately sought to compel forced labor"). And Muchira cannot establish a forced labor claim by presenting evidence that her employment environment caused her to experience psychological harm. Rather, Muchira must present sufficient evidence upon which a jury could reasonably conclude that the Saudi family *knowingly* or *intentionally* engaged in actions or made threats that were sufficiently serious to compel a reasonable person in Muchira's position to *remain* in the Saudi family's employ, against her will and in order to avoid such threats of harm, when she otherwise would have left. She has

26

failed to do so. The record does not suggest that the Saudi family knowingly forced Muchira to provide her labor or services by means of serious harm or threats of serious harm, that she continued to labor in order to avoid physical or psychological harm, or that the conditions of her employment were such that she reasonably believed that she had no viable "exit option." *Calimlim*, 538 F.3d at 712.

Muchira was not an especially vulnerable victim. She was not young, inexperienced, or brought to this country illegally. Muchira was 32 years old when she began her employment with the Saudi family in Saudi Arabia and an experienced household employee, having worked for other families and for a hotel in Kenya under cultural rules and restrictions similar to those that exist in Saudi Arabia. Prior to her agreeing to come to the United States, Muchira had worked for the Saudi family for seventeen months in Saudi Arabia, and she had made the voluntary decision to terminate her employment relationship with the Saudi family and remain in Kenya, apparently without sufficient fear of adverse consequences that would have compelled her to return to Saudi Arabia. She was well aware of the Saudi cultural rules and expectations related to her employment. However, when the Saudi family asked Muchira to continue her employment with them in the United States, Muchira changed her mind and agreed to continue working for the family in this country. Muchira is also proficient in reading and writing English. She was able to read the contract for her employment in the United States, she reviewed the terms of the contract with the family before signing it, and she came to the United States voluntarily with full knowledge of the modified, verbal pay provision.

During the eight months that Muchira lived and worked for the Saudi family in the United States, she was not subjected to squalid or otherwise intolerable living conditions, so as to reasonably lead her to believe that she was effectively imprisoned in her employment situation. Muchira was initially provided with a private, one-bedroom apartment, with unfettered ability to come and go from her apartment. When the family moved to the Vienna home three months later, Muchira returned to her status as a live-in housemaid, but she was provided with a comfortable, private bedroom on a separate floor from the family with a nearby door that led directly outside. Both of the Saudi homes in the United States were urban in nature, and Muchira had an unobstructed ability to walk away at any time, and to any number of close-by public places, including several Christian churches. The Vienna home was equipped with an alarm system when the Saudi family leased it. However, there is no evidence (beyond Muchira's conclusory allegation) that the Saudi family ever set the alarm as a means of imprisonment, instead of as a means of security. Muchira testified that she was not given the alarm code, but neither did she ask for it. And, in any event, the alarm was not set during the day, when she and Halah were usually home alone. Thus, Muchira had innumerable opportunities to walk out of the Saudi home without triggering the alarm.

With regard to the Saudi "house rules," Muchira worked under these rules for seventeen months in Saudi Arabia and, by her own admission, there was no discussion and no stated expectation that they would or would not continue to apply in this country. Even if they did, it is clear that adherence to these cultural rules did not result in the type of "extreme isolation" that would lead a reasonable person in Muchira's situation to

28

believe that she was psychologically imprisoned in a forced-labor situation. Muchira was frequently included in family outings and trips. She had virtually unfettered access to a private cell phone and to the Internet, provided by the Saudi family, and she had substantial opportunity to use these forms of communication in the privacy of her living quarters. The Saudi family also assisted Muchira in setting up her Facebook account, and they did not attempt to prohibit her from using social media as an additional means to communicate with her friends and family, except when it interfered with Muchira's performance of her job duties. By providing Muchira with a cell phone with Internet access, the Saudi family also opened the door for Muchira to educate herself in innumerable ways. And, of course, Muchira was at all times in possession of the NHTRC pamphlet and Hotline number, and she was told by the Embassy official in Saudi Arabia that she should call the Hotline number if she felt mistreated at any time. Yet she did not seek to leave her employment situation until she was weeks away from leaving the United States and returning to her home in Kenya.

In the end, Muchira has presented evidence that the conditions of her employment were only somewhat better than those that she had labored under in Saudi Arabia, that she had hoped for a different experience in the United States, and that she came to realize that her pay and hours violated the wage standards in this country. Apparently, Muchira may also have begun to view the Saudi cultural rules to be oppressive and archaic, and she desired to take advantage of the other opportunities that this country could provide. *See* J.A. 669 (Muchira's testimony that she "learn[ed] that in America there [are] opportunities like [the] chance to go back to school and continue with my education,

29

which I believe when I go to Kenya, at my age I'm not able to . . . go back to education"). But, as the district court noted, "[w]hile the 'house rules' may have made [Muchira's] life more onerous and less pleasant than it otherwise might have been, the evidence is insufficient to establish that those 'house rules' ever prevented [Muchira] from doing what she ultimately did do – terminate her employment" and walk away. J.A. 1048; *see Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1177 (9th Cir. 2012) (rejecting forced labor claims where the alleged victims were physically able to walk away at any time and successfully did so "the first time [they] tried").

Finally, even if there were sufficient evidence upon which a jury could conclude that the "house rules" and other employment conditions were "sufficiently serious" to cause Muchira to reasonably believe that she could not terminate her employment and return to Kenya, there is no evidence that the Saudi family *knowingly* subjected Muchira to those conditions as a means to coerce her into staying when she otherwise would have left. According to Muchira's own testimony, the Saudi family asked her if she would like to continue to work for the family in the United States, while she was in Kenya and outside of their control, and they employed no means of force or threats to bring her here. They never discussed the continued applicability of the cultural rules in the United States, and Muchira never asked to return to Saudi Arabia or Kenya. In short, the employment relationship was for the most part unchanged from what it had been in Saudi Arabia, both from the standpoint of the Saudi family and Muchira.

Accordingly, we agree that Muchira failed to present sufficient evidence to demonstrate that the Saudi family knowingly coerced her into providing labor and

30

services for them in the United States by subjecting her to harm "that [was] sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances [as Muchira] to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c). Muchira has presented evidence that she suffered from depression, stress, and other psychological maladies related to her "bad employer-immigrant" relationship. *Dann*, 652 F.3d at 1170. She has presented evidence that she did not want to return to Saudi Arabia with the family, nor did she want to return to her home in Kenya. However, she has failed to present sufficient evidence that the Saudi family forced her to remain in their employ against her will, by means of physical or psychological coercion, when she otherwise would have left and returned home to Kenya as she had previously done in Saudi Arabia.

B.

We likewise reject Muchira's claims that she has presented sufficient evidence that the Saudi family knowingly coerced her into providing her labor and services by "by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3). Muchira argues that the Saudi family violated this portion of the forced labor statute by "coach[ing]" her to lie to the immigration officials about the $1600 pay provision in her employment contract. J.A. 540.

Again, Muchira misapprehends the statutory requirements of the TVPA. The term "'abuse or threatened abuse of law or legal process,' means the use or threatened use of a law or legal process . . . in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). It

31

requires more than evidence that a defendant violated other laws of this country or encouraged others to do the same. It requires proof that the defendant "knowingly" abused the law or legal process as a means to <u>coerce</u> the victim to provide labor or services against her will. 18 U.S.C. § 1589(a).

Muchira has failed to present sufficient evidence to satisfy these statutory requirements. While we do not condone the deception that was allegedly employed at the Embassy in Saudi Arabia, Muchira admits that she came to the United States voluntarily, with full knowledge of the $400 pay provision, and that she was complicit in any deception. She was privately interviewed at the Embassy and affirmed the validity of the terms of the written employment contract. She has presented no evidence that the Saudi family forced or pressured her into lying to the United States authorities by means of threats or other serious harm, or that they otherwise coerced or tricked her into applying for a visa so as to illegally traffic her into the United States. On the contrary, she testified that she "had a right to lie" because she would have otherwise lost the opportunity to another of the Saudi family housemaids. J.A. 355.

Similarly, when Muchira was informed that the Saudi family was applying for 6-month extensions of their visas, the Saudi family did not threaten Muchira with arrest or other adverse consequences if she refused to sign the necessary documents. Muchira testified that she did not read the pertinent documents, but she assumed "all was well." J.A. 234. In any event, Muchira admits that she was aware of the Saudi family's plans, and she felt confident enough in the employment relationship to "refuse[] to go to Saudi

Arabia" directly from the United States in May, and to successfully "negotiat[e] with the family" to pay for her to return directly to Kenya instead. J.A. 728.

Muchira's claim that she presented sufficient evidence that the Saudi family coerced her into remaining in their employment in the United States by withholding her passport as an "implicit threat of arrest" also fails. Appellants' Brief at 46.

The confiscation of an immigrant's passport and threats of arrest are common threats of legal process resorted to by traffickers and others who seek to instill fear in persons and force them to labor against their will. *See, e.g., Callahan*, 801 F.3d at 615, 620 (defendants, among other things, ordered developmentally disabled victim to beat her minor daughter, filmed the beating, and then threatened victim that they would call law enforcement and have her daughter taken away from her if she did not continue to comply with their demands); *Bradley*, 390 F.3d at 148-49 (defendants, among other things, coerced Jamaican workers to continuing to work by threatening to call the police and immigration authorities, seizing the workers' passports after one worker escaped, and telling the workers that they were legally in debt to the employer). However, Muchira's evidence in support of her "implicit threat of arrest" claim consists of little more than conclusory and speculative allegations that fall far short of establishing that this fear was reasonable or that the Saudi family intended to instill any such fear.

Muchira was not an undocumented immigrant. She was at all times legally present in this country and able to communicate in English. Her testimony is sufficient to support a finding that the Saudi family kept her passport, just as they had done in Saudi Arabia, in accordance with the cultural practices of their country. But it is insufficient to

33

support a finding that the Saudi family "seized" or "withheld" Muchira's passport as a means of forcing her to remain in a condition of involuntary servitude. Muchira admits that she never asked to maintain possession of her passport and she was never told that she could not. Rather, she assumed that this Saudi cultural rule or custom likewise continued to apply in the United States. And she was given her passport every time that she needed it. There is also insufficient evidence that the Saudi family knowingly took actions that were intended as an implicit threat of arrest. The Saudi family never told Muchira that she could not go out alone in the United States, or that she would suffer adverse consequences if she tried to do so. Muchira also admits that she ventured out unaccompanied when she lived in her apartment, and that she accompanied the Saudi family on numerous public outings without her passport.

Of course, Muchira may well have been legitimately anxious or fearful when she ultimately left the Saudi family home in the Spring of 2013. She had no assurances that she would be able to remain in the United States, and she knew that she faced the prospect of having to return immediately to Kenya under the terms of her visa. That same knowledge may well have caused her to feel pressure to stay with the Saudi family for as long as she did, because Muchira did not want to return to Kenya. However, that pressure was not brought to bear by the Saudi family. Ordinarily, when "applying the Act, we must distinguish between '[]improper threats or coercion and permissible warnings of adverse but legitimate consequences.'" *Headley*, 687 F.3d at 1180 (quoting *Bradley*, 390 F.3d at 151). Here, Muchira does not even claim that the Saudi family warned her of the *legitimate* consequences that would ensue if she left their employment

34

in the United States. For that matter, there is no evidence that the Saudi family was aware that Muchira wanted to leave. But Muchira understood that she had only been granted a temporary visa to accompany the Saudi family to the United States to work, that she was not allowed to seek or accept other employment while in this country, and, therefore, that her being forced by immigration officials to return to Kenya was a possible and legitimate consequence that would accompany her decision to leave her employment.[5]

Accordingly, we hold that Muchira has failed to present sufficient evidence that the Saudi family knowingly coerced her into providing her labor and services "by means of the abuse or threatened abuse of law or legal process," 18 U.S.C. § 1589(a)(3), so as to withstand summary judgment.

IV.

In conclusion, the record in this case indicates that the Saudi family may well have violated the FLSA or state law by failing to pay Muchira the wages that she was entitled to receive for the long hours that she worked as a domestic servant for the Saudi family in

---

[5] Muchira asserts that she did not want to return to Kenya because she had promised to pay her pastor a fee equivalent to one and a half months' salary for arranging her original employment with the Saudi family in Saudi Arabia, and she had never paid him. However, Muchira has never denied that she was paid in Saudi Arabia and in the United States. She also sent more than the $400 per month that she was earning in the United States to her family in Kenya, which would have been more than sufficient to pay her purported debt. Also, Muchira does not deny that prior to coming to the United States, she had made the decision to remain in Kenya, apparently without fear of this alleged debt. In any event, there is no evidence that the Saudi family knew about her alleged outstanding debt to her pastor, much less threatened her with it, and any pressure that Muchira experienced was not knowingly brought to bear by the Saudi family as a means to coerce her into continuing her employment in the United States.

this country. As to those claims, Muchira successfully terminated her employment relationship with the Saudi family and she has successfully pursued her wage-related remedies via a settlement.

The forced labor provisions of § 1589(a) of the TVPA, however, serve a much different purpose. Muchira has presented evidence that she was disappointed, stressed and depressed about her employment situation in the United States. By Muchira's own admissions, she did not want to remain in the employ of the Saudi family, but she did not want to return to her home in Kenya either. She wanted to remain in the United States and enjoy its abundant educational and employment opportunities. However, the forced labor provisions of the TVPA are not intended to redress every bad employment relationship involving immigrants, or to punish immigrants for adhering to cultural rules and restrictions that many in this country would refuse to abide by. They are intended to effectuate the constitutional prohibitions against slavery and involuntary servitude, by criminalizing the act of coercing persons into providing labor and services against their will and by providing a civil remedy to the victims of such actions. Muchira has failed to develop sufficient evidence upon which a jury could reasonably conclude that the Saudi family knowingly forced or coerced her to come to the United States, or to remain in their employ against her will, by means of serious psychological harm or abuse of law or legal process, when she otherwise would have left and returned to her home country. Accordingly, we affirm the district court's grant of summary judgment to the defendants.

AFFIRMED

36